In re "AGENT ORANGE" PRODUCT
LIABILITY LITIGATION.

Joe Isaacson and Phillis Lisa
Isaacson, Plaintiffs,

v.

Dow Chemical Company,
et al., Defendants,

Daniel Raymond Stephenson,
et al., Plaintiffs,

v.

Dow Chemical Company,
et al., Defendants.

Nos. MDL 381, CV 98–6383(JBW),
CV 99–3056(JBW).

United States District Court,
E.D. New York.

Feb. 9, 2004.

Smoger & Associates by Gerson Smoger, Oakland, CA, for Plaintiffs Joe Isaacson; and Phillis Lisa Isaacson.

Kelley Drye & Warren LLP by William A. Krohley; Willam C. Heck, New York, NY, for Defendant Hercules, Inc.

Rivkin Radler & Kremer by Steven Brock; James V. Aiosa, Uniondale, NY, Orrick, Herrington & Sutcliffe LLP by James Lamont Stengel, New York, NY, for Defendant The Dow Chemical Company.

Cadwalader, Wickersham & Taft LLP by Michael M. Gordon, New York, NY, for Defendant Occidental Chemical Corporation.

Seyfarth Shaw LLP by John C. Sabetta; Andrew T. Hahn, Sr., New York, NY, Latham & Watkins by James E. Tyrrell, Newark, NJ, for Defendant Monsanto Company.

Myron Kalish, New York, NY, for Defendant Omniroyal, Inc.

Clark, Gagliardi & Miller by Lawrence T. D'Aloise, White Plains, NY, for Defendants T.H. Agriculture & Nutrition Co.

MEMORANDUM, ORDER, JUDGMENT of DISMISSAL, and STAY in AGENT ORANGE III

Williams, Cuker, Berezofsky by Mark R. Kuker; Dan Bencivenga, Cherry Hill, NJ,

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................. 407

II. AGENT ORANGE LITIGATIONS ....................................... 410
 A. Generally ............................................. 410
 B. Agent Orange I......................................... 415
 1. MDL Panel......................................... 416
 2. 1983 Class Certification ......................... 417
 3. Class and Notice ................................. 417
 4. Settlement ....................................... 418
 5. Post Settlement .................................. 418

 a. Dismissal of Opt–Out Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 419
 b. Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 419
 6. Plan for Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 420
 7. Distribution of Settlement Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 421
 C. Agent Orange II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 421
 D. Agent Orange III, the Instant Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . 422
 1. District Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422
 2. Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 423

III. FACTS AS TO GOVERNMENT CONTRACTOR DEFENSE . . . . . . . . . . . . . . . . . 424
 A. Orders from Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424
 B. Awareness by Government of Dangers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 426
 C. Designation by Government of Specifications . . . . . . . . . . . . . . . . . . . . . . . . 429

IV. LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431
 A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431
 B. Government Contractor Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 432
 1. Reasonably Precise Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 433
 2. Conformity to Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434
 3. Warning of Dangers Not Known to Government . . . . . . . . . . . . . . . . . . . 435
 C. Claims Based on Failure to Warn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 436
 D. Claims Based on Manufacturing Defects . . . . . . . . . . . . . . . . . . . . . . . . . . . 437
 E. Cost of Denying Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 438
 F. Decisions Applying Defense to Agent Orange . . . . . . . . . . . . . . . . . . . . . . . . 439

 V. APPLICATION OF LAW TO FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 441

 VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442

VII. DISCOVERY AND STAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442

## I. Introduction

Plaintiffs, Vietnam veterans, sue manufacturers who supplied Agent Orange, a herbicide used in the 1960s by the United States armed forces as a spray, primarily from aircraft, to reduce foliage behind which the enemy might lurk. They allege that they suffer from diseases that have just recently become apparent, and that the cause of their ailments is the negligence of the manufacturers in delivering to the government Agent Orange containing an unnecessary toxic substance—dioxin. Mistakes in and of Vietnam can be attributed to the United States under at least three presidents. *Cf.* "The Fog of War" (Sony Classics 2003) (former Secretary of Defense Robert S. McNamara on Agent Orange and related matters). These errors do not form the basis for a tort action by these plaintiffs against these defendants.

In earlier waves of such suits in the 1970s, 1980s and 1990s, the courts concluded that none of the available evidence would support a finding to a more-probable-than-not standard of causality between exposure to Agent Orange and disease (except for a quickly discoverable and curable form of skin irritation, chloracne). The scientific basis for that conclusion of lack of any substantial proof of causality, either general or specific to individuals, remains much the same. *See* Institute of Medicine, Veterans and Agent Orange: Update 2002 (2003).

Congress has now provided for payment to veterans of compensation for a series of diseases presumptively caused by exposure to Agent Orange. *See, e.g. McMillan v. Togus Regional Office, Dep't of Veterans Affairs,* 294 F.Supp.2d 305 (E.D.N.Y. 2003) ("Based on statistical associations, the

Academy's studies have resulted in the creation of presumptions that certain diseases are attributable to Agent Orange for purposes of Veteran's compensation. These 'associations' are not equivalent to cause in a legal sense for such purposes as mass tort liabilities. These presumption decisions are made by the Secretary for Veterans Affairs. A showing of cause to any degree of probability is not required. The result is summarized in the privately funded National Veterans Legal Services Program, *Self–Help Guide on Agent Orange, Advice for Vietnam Veterans and their Families* (2000 plus supplement) ('Self–Help Guide'), financed, in part, by this court from proceeds from an Agent Orange Settlement Fund created by contributions from manufacturers of Agent Orange.").

Some three hundred and thirty million dollars was distributed to veterans and their families from an Agent Orange Settlement Fund resulting from a class action. Payments into the fund of one hundred and eighty million dollars were made by defendants in the instant case in settlement of the class action designed to terminate any liability they might have—present or future—for the production of Agent Orange. *See* Deborah E. Greenspan, Special Master, *In Re "Agent Orange" Product Liability Litigation:* Final Report of the Special Master on the Distribution of the Agent Orange Settlement Fund (1997) ("Final Report"). A total of 105,817 individual veterans' claims were processed, of which 52,220 were approved for payment from the Fund. *Id.* at 30. 24,776 individual appeals were decided by the court and Special Master for Appeals. The Class Assistance Program for members of veterans' families granted funds to programs that served 239,110 members of Vietnam veterans' families. *Id.* at 41. Funds to many Vietnam veterans in Australia and New Zealand were distributed by committees in those countries.

In the present suit, plaintiff Joe Isaacson alleges that he has non-Hodgkin's lymphoma and other ailments that he attributes to exposure to Agent Orange while serving as a crew chief for an attack fighter squadron in Vietnam from 1968 to 1969; his wife sues for loss of consortium. Plaintiff Daniel Raymond Stephenson alleges that he has multiple myeloma, a cancer of the bone marrow, from exposure to Agent Orange while serving both on the ground in Vietnam from 1965 to 1966 and as a helicopter pilot from 1969 to 1970; his wife and children sue for loss of consortium. These diseases may be recognized by the Veterans Administration as presumptively connected to Agent Orange exposure. *See* Self–Help Guide at 5–6. Under the government program, both plaintiff veterans might qualify for a veteran's disability benefit regardless of when these diseases first appeared. *Id.* Both veterans allege that they discovered their diseases after the Agent Orange Fund had been fully expended and it was too late to apply for payment as a member of the class; that they had not been properly represented as members of the class; and that the settlement did not bind them.

Plaintiffs claims are based on theories of strict products liability in tort, including design defects, manufacturing defects, failure to warn, breach of implied warranty, negligence, fraud, and misrepresentation. They seek compensatory and punitive damages. All of the claims center on the presence of 2,3,7,8–tetrachlorodibenzo para dioxin ("dioxin") in Agent Orange.

Defendants manufactured and sold Agent Orange to the United States government for use by the military as a defoliant in Vietnam pursuant to contracts they entered into with the government at various times during the 1960s. They contend

that dioxin contamination was known to, and considered by, the government in light of all the information then available of the possible hazards it posed, at the time Agent Orange was ordered from defendants and used in Vietnam. They claim that they were ordered by the government to supply the product according to government specifications; that the material supplied by the defendants was manufactured, mixed, used and marked on government orders and under its supervision; that the government was fully aware of dangers; and that the warnings they would have used had a similar product been sold commercially by them were omitted by government direction—in short, that the government contractor defense applies.

Because the present plaintiffs discovered what they believe to be their Agent Orange-related diseases after the Agent Orange Fund was fully expended, the appellate courts have now held that these post-Fund-discovery plaintiffs are not bound by the class action settlement that created the Fund. *Stephenson. v. Dow Chemical,* 273 F.3d 249 (2d Cir.2001), *aff'd as to the Stephensons by an equally divided 4 to 4 court and vacated as to the Isaacsons in light of Syngenta Crop Protection, Inc. v. Henson, in Dow Chemical Co. v. Stephenson,* 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003).

Defendants might have moved for summary judgment on the ground that plaintiffs could not prove causality, or for other reasons. Instead, they have chosen to seek dismissal based only on the government contractor defense. "If a subsequent summary judgment motion raises different issues, however, including grounds different from those raised in the first motion, it is considered proper and will be reviewed and decided by the court." 3 Moore's Federal Practice § 56.10[7].

Two procedural approaches are at war. First, it is desirable to provide a court with all possible credible bases for disposing of a case on the merits at one time in order to avoid the necessity of successive motions. Second, it is useful to minimize the burden of a litigation by resolving it on a theory requiring the least expense and consumption of time even though another theory could be established by the available proof. Such tactical courage is unusual since it risks a loss on appeal should only one member of the Court of Appeals panel prefer the basis proffered for finding in the movants' favor, while another would have favored only another basis which was not put forward, and the third member would reject both.

Here the second path is defensible. Were the motion for summary judgment made on the ground of lack of plausible causality evidence sufficient to support a verdict, enormous epidemiological and exposure data as well as details of plaintiffs' service in Vietnam and medical history might need to be explored in pretrial proceedings at great expense to the parties. *Daubert* and other hearings would probably be required. It is much simpler to decide the case in the first instance on the dispositive government contractor defense.

As indicated below, Part VII, *infra,* the court is tentatively ruling on the motion for summary judgment even though it is allowing plaintiffs additional time for discovery. Plaintiffs' contention that they have faced difficulties in obtaining information sufficient to contest the motion appears based in part on the fact that many of the critical acts occurred many years ago. By tentatively deciding the motion now, and permitting discovery over the period requested by plaintiffs, the court focuses the parties' attention on the critical issues and evidence. *Cf. Mason Tenders Dist. Council Pension Fund v. Messera,* 958 F.Supp. 869, 894 (S.D.N.Y.1997) (denying request for further discovery

when party lacked specificity as to what additional information was required). Normally a court will postpone decision on a summary judgment motion until the completion of discovery. If a court finds, however, that a party cannot present facts sufficient to oppose the motion, it may *inter alia* "make such other order as is just." Fed.R.Civ.P. 56(f); *see also* 3 Moore's Federal Practice § 56.10[8][a].

The rest of this memorandum is divided as follows: Part II recounts briefly prior Agent Orange litigation; Part III states the facts relating to the government contractor defense; Part IV sets out the law on the government contractor defense; Part V applies the law to the facts; Part VI is the Conclusion dismissing the complaints; and Part VII stays the judgment until the completion of further discovery.

## II. Agent Orange Litigations

Litigation arising from claims that Vietnam veterans contracted diseases as a result of defendants' supplying Agent Orange has been extensive. It is briefly summarized below. The docket sheets in this court under MDL 381 (Agent Orange) list almost 17,000 entries (Hon. Sol Schreiber and Hon. Shira A. Scheindlin supervising discovery). In addition there are: hundreds of thousands of inquiries, applications and decisions of the Agent Orange insurance facility; tens of thousands of administrative appeals (Special Master for Appeals W. Bernard Richland); decisions in the operation of the payment plan (Special Masters Kenneth R. Feinberg and Deborah Greenspan); decisions and minutes of the Advisory Committee to the Court of Vietnam Veterans (Charles Timothy Hagel et al. advisors); decisions and minutes of the Advisory Committees on Banks and Investments (Richard J. Davis et al. advisors); reports of the banks, investment advisers, the insurance facility, and others; extensive correspon-

dence, books, training guides, brochures, reports and video cassettes for those providing services to families under the direction of the court created Agent Orange facility which dealt with families and social agencies in all the states, Puerto Rico and United States dependencies (Dennis K. Rhodes, administrator); and correspondence reports and orders in connection with services to Australian and New Zealand veterans. These huge files are available in the archival storage of this court and in the National Archives. *See* Final Report.

## A. Generally

The current controversy is part of a continuing litigation whose first phase ended in settlement after six years of effort by many lawyers and court officers—special masters, magistrates, and judges. Among the hundreds of published and unpublished decisions, see *Dow Chemical Co. v. Stephenson*, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (per curiam); *Dow Chemical Co. v. Ryan*, 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987); *Stephenson v. Dow Chemical Co.*, 346 F.3d 19 (2d Cir.2003); *Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 51 Fed. R. Serv.3d 334 (2d Cir.2001); *Miller v. Diamond Shamrock Co.*, 275 F.3d 414 (5th Cir.2001) (holding that plaintiff's claims were barred by the government contractor defense); *In re "Agent Orange" Prod. Liab. Litig.*, 1999 WL 1045197 (E.D.N.Y.1999); *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir.1998) (holding that plaintiffs' claims were barred by the government contractor defense); *Jenkins v. Agent Orange Settlement Fund*, 131 F.3d 131 (2d Cir. Dec 17, 1997) (unpublished disposition); *Addington v. Agent Orange Veterans Payment Program*, 131 F.3d 130 (2d Cir. Nov 24, 1997) (unpublished disposition); *Gough v. Agent Orange Settlement*

*Fund,* 104 F.3d 353 (2d Cir. Nov 05, 1996) (unpublished disposition); *In re Agent Orange Prod. Liab. Litig.,* 996 F.2d 1425 (2d Cir.1993); *Ryan v. Dow Chemical Co.,* 781 F.Supp. 902 (E.D.N.Y.1991) (plaintiffs cannot collaterally attack prior settlement); *In re Ivy,* 901 F.2d 7 (2d Cir.1990) (MDL Panel had jurisdiction to transfer); *In re "Agent Orange" Prod. Liab. Litig.,* 689 F.Supp. 1250 (E.D.N.Y.1988) (approved settlement and allowed opt-out claimants to be included in class); *In re "Agent Orange" Prod. Liab. Litig.,* 821 F.2d 139, 56 U.S.L.W.2028, 7 Fed. R. Serv.3d 1091 (2d Cir.1987) (no abuse of discretion in unsealing documents); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 179, 7 Fed.R.Serv.3d 1078 (2d Cir. 1987) (appeal reviewing settlement plan); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 194 (2d Cir.1987) (affirming dismissal of Federal Tort Claims Act claims of servicemen); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 204 (2d Cir. 1987); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 210 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 216 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.,* 475 F.Supp. 928, 206 U.S.P.Q.2d (BNA) 378 (E.D.N.Y.1979) (dismissing federal constitutional and statutory claims, reserving possible federal common law claims, denying motion to limit communications to third parties); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 737 (E.D.N.Y.1979) (finding subject matter jurisdiction on basis of federal common law issues), *rev'd,* 635 F.2d 987 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *In re "Agent Orange" Prod. Liab. Litig.,* 1980 WL 324478, 28 Fed.R.Serv.2d 993 (E.D.N.Y.1980) (granting motion of terminally ill plaintiff to videotape his own deposition); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 750 (E.D.N.Y.1980) (ordering government to refrain from destruction of documents pursuant to internal procedure); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 753 (E.D.N.Y.1980) (various orders concerning modification of complaint and answers); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 754 (E.D.N.Y.1980) (ordering videotaped deposition); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 756 (E.D.N.Y.1980) (establishing agenda for status conference); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 757 (E.D.N.Y.1980) (requiring plaintiffs to file individual notices to retain right to bring actions against federal government); *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 762 (E.D.N.Y.1980) (dismissing claims against government as third-party defendant, establishing case management plan, conditionally certifying Rule 23(b)(3) class, and denying defendants' motion for summary judgment); *In re "Agent Orange" Prod. Liab. Litig.,* 91 F.R.D. 616 (E.D.N.Y.1981) (establishing committee to review procedures for videotaped depositions); *In re "Agent Orange" Prod. Liab. Litig.,* 91 F.R.D. 618 (E.D.N.Y.1981) (allowing motion to amend caption, denying motion to amend complaint, denying defendants' motion for summary judgment on government contractor defense); *In re "Agent Orange" Prod. Liab. Litig.,* 93 F.R.D. 514 (E.D.N.Y.1982) (allowing defendant to proceed with scheduled destruction of documents); *In re "Agent Orange" Prod. Liab. Litig.,* 534 F.Supp. 1046 (E.D.N.Y.1982) (denying reargument on dismissal of government as third-party defendant, denying interlocutory appeal, provisionally dismissing claims against non-manufacturer defendants, denying motion to form steering committee for plaintiffs'

counsel, denying motion for decertification of class, deferring decision on statute of limitations issues, and establishing elements of government contractor defense); *In re "Agent Orange" Prod. Liab. Litig.*, 537 F.Supp. 977 (E.D.N.Y.1982) (provisionally dismissing claims against non-manufacturer defendant); *In re "Agent Orange" Prod. Liab. Litig.*, 94 F.R.D. 173 (E.D.N.Y.1982) (appointing special master to supervise discovery); *In re "Agent Orange" Prod. Liab. Litig.*, 544 F.Supp. 808 (E.D.N.Y.1982) (denying motion to disqualify defense attorneys; provisionally dismissing claims against certain non-manufacturer defendants, and denying motion to implead suppliers); *In re "Agent Orange" Prod. Liab. Litig.*, 95 F.R.D. 191 (E.D.N.Y.1982) (clarifying that denial of motion to implead suppliers was without prejudice); *In re "Agent Orange" Prod. Liab. Litig.*, 95 F.R.D. 192 (E.D.N.Y.1982) (affirming special master's ruling as to location of depositions); *In re "Agent Orange" Prod. Liab. Litig.*, 96 F.R.D. 578 (E.D.N.Y.1983) (adopting special master's protective order for discovery of government documents); *In re "Agent Orange" Prod. Liab. Litig.*, 96 F.R.D. 582 (E.D.N.Y.1983) (rejecting first amendment challenge to protective order); *In re "Agent Orange" Prod. Liab. Litig.*, 96 F.R.D. 587 (E.D.N.Y.1983) (adopting with modifications special master's order regarding videotaped depositions); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 424 (E.D.N.Y.1983) (adopting protective order); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 424 (E.D.N.Y.1983) (adopting special master's protective order for Department of Agriculture documents); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 427 (E.D.N.Y.1983) (adopting special master's procedures for discovery of documents possibly subject to executive privilege); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 541 (E.D.N.Y.1983) (denying interlocutory appeal of decision deferring certification of class and determination of appropriate notice); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 542 (E.D.N.Y.1983) (affirming special master's denial of discovery request); *In re "Agent Orange" Prod. Liab. Litig.*, 565 F.Supp. 1263 (E.D.N.Y.1983) (granting summary judgment for four defendants on government contractor defense; denying summary judgment for other defendants); *In re "Agent Orange" Prod. Liab. Litig.*, 98 F.R.D. 522 (E.D.N.Y.1983) (adopting order of special master concerning discovery of government documents); *In re "Agent Orange" Prod. Liab. Litig.*, 98 F.R.D. 539 (E.D.N.Y.1983) (adopting special master's order to unseal documents in connection with summary judgment motions); *In re "Agent Orange" Prod. Liab. Litig.*, 98 F.R.D. 554 (E.D.N.Y.1983) (denying request for reconsideration of order to unseal documents); *In re "Agent Orange" Prod. Liab. Litig.*, 98 F.R.D. 557 (E.D.N.Y.1983) (ordering special master to review discovery decisions in light of court's decision to try causality and liability issues); *In re "Agent Orange" Prod. Liab. Litig.*, 98 F.R.D. 558 (E.D.N.Y.1983) (approving special master's order of additional discovery to clarify circumstances surrounding document destruction); *In re "Agent Orange" Prod. Liab. Litig.*, 570 F.Supp. 693 (E.D.N.Y.1983) (clarifying program for discovery); *In re "Agent Orange" Prod. Liab. Litig.*, 571 F.Supp. 481 (E.D.N.Y.1983) (granting motion of law firm to be relieved as lead counsel for plaintiffs and appointing new plaintiffs' management committee); *In re "Agent Orange" Prod. Liab. Litig.*, 99 F.R.D. 338 (E.D.N.Y.1983) (approving discovery recommendations of special master); *In re*

*"Agent Orange" Prod. Liab. Litig.,* 99 F.R.D. 645 (E.D.N.Y.1983) (lifting prior protective order applying to government documents obtained during discovery); *In re "Agent Orange" Prod. Liab. Liab.,* 100 F.R.D. 718 (E.D.N.Y.) (certifying Rule 23(b)(3) and Rule 23(b)(1)(B) classes), *appeal denied,* 100 F.R.D. 735 (E.D.N.Y. 1983), *mandamus denied,* 725 F.2d 858 (2d Cir.1984), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); *In re "Agent Orange" Prod. Liab. Litig.,* 100 F.R.D. 778 (E.D.N.Y.1984) (denying motion to implead suppliers of chemical components); *In re "Agent Orange" Prod. Liab. Litig.,* 580 F.Supp. 690 (E.D.N.Y.1984) (finding national consensus law on issues of liability, government contractor defense and punitive damages); *In re "Agent Orange" Prod. Liab. Litig.,* 580 F.Supp. 1242 (E.D.N.Y.1984) (reinstating third-party plaintiffs' claim for indemnity against government with respect to claims of veterans' wives and children), *mandamus denied,* 733 F.2d 10 (2d Cir.1984), *appeal denied,* 745 F.2d 161 (2d Cir.1984), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984); *In re "Agent Orange" Prod. Liab. Litig.,* 101 F.R.D. 97 (E.D.N.Y.1984) (ordering in camera disclosure of names of scientists deleted from government report); *In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. 740 (E.D.N.Y.1984) (approving settlement of class action subject to fairness hearings); *In re "Agent Orange" Prod. Liab. Litig.,* 603 F.Supp. 239 (E.D.N.Y.1985) (dismissing claims of veterans' wives and children against government), *aff'd in part, vacated in part,* 818 F.2d 201 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); *In re "Agent Orange" Prod. Liab. Litig.,* 104 F.R.D. 559 (E.D.N.Y. 1985) (modifying protective orders); *In re "Agent Orange" Prod. Liab. Litig.,* 105

F.R.D. 577 (E.D.N.Y.1985) (affirming with modification magistrate's order that defendants in two non-settled cases produce deponents); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1221 (E.D.N.Y. 1985) (dismissing defendants' claim for indemnity from government for settlement payments to veterans' families), *aff'd,* 818 F.2d 204 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223 (E.D.N.Y.1985) (ruling as to admissibility of opt-out plaintiffs' scientific evidence and expert testimony and granting summary judgment in favor of defendants for plaintiffs' failure to establish causation), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1267 (E.D.N.Y.1985) (same), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1285 (E.D.N.Y.1985) (dismissing action brought by Hawaiian civilians), *aff'd in part, vacated in part,* 818 F.2d 210 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); *In re "Agent Orange" Prod. Liab Litig.,* 611 F.Supp. 1290 (E.D.N.Y.1985) (dismissing claim of civilian physician for failure to demonstrate exposure to herbicides), *aff'd in part, vacated in part,* 818 F.2d 210 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1296 (E.D.N.Y.1985) (determining class-action plaintiffs' attorney fees and reaffirming settlement); *aff'd in part, rev'd in part,* 818 F.2d 226 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1396 (E.D.N.Y.1985) (establishing plan for disbursement of settlement fund pending appeals), *aff'd in part, rev'd in part,* 818 F.2d 179 (2d Cir.1987); *In re*

*"Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1452 (E.D.N.Y.1985) (denying motion to set aside attorney fee-sharing arrangement), *rev'd in part,* 818 F.2d 216 (2d Cir.), *cert. denied,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); *In re "Agent Orange" Prod. Liab. Litig.,* 618 F.Supp. 623 (E.D.N.Y.1985) (approving settlement of class action and dismissing with prejudice claims of class members) (Special Masters for Settlement Kenneth R. Feinberg and David I. Shapiro); *In re "Agent Orange" Prod. Liab. Litig.,* 618 F.Supp. 625 (E.D.N.Y.1985) (approving plan for Australia and New Zealand); *In re "Agent Orange" Prod. Liab. Litig.,* 787 F.2d 822 (2d Cir.1986) (dismissing claims of non-class plaintiffs against defendant not named in complaints); *In re "Agent Orange" Prod. Liab. Litig.,* 800 F.2d 14 (2d Cir.1986) (denying motion to disqualify plaintiffs' attorneys from appealing settlement); *In re "Agent Orange" Prod. Liab. Litig.,* 804 F.2d 19 (2d Cir.1986) (denying repeal of stay on settlement funds pending appeal); *In re "Agent Orange" Prod. Liab. Litig.,* 689 F.Supp. 1250 (E.D.N.Y.1988) (modifying class assistance program as required by 818 F.2d 179 and granting opt-out plaintiffs opportunity to opt into class for purposes of benefitting from settlement fund). *See also* other Agent Orange cases: *Ryan v. Dow Chemical Co.,* 781 F.Supp. 934 (E.D.N.Y.1992); *Ryan v. Dow Chemical Co.,* 1991 WL 243311 (E.D.N.Y., Nov 12, 1991); *In re Agent Orange Fee Application of Yannacone,* 139 F.R.D. 581 (E.D.N.Y.1991); *Ryan v. Dow Chemical Co.,* 1991 WL 200866, 60 U.S.L.W. 2284 (E.D.N.Y.1991). For further information, see *VA Home Page, Agent Orange and Vietnam Veterans, Agent Orange Helpline, e-mail GW/AO **Helpline@vba.va.gov*** (2003); Jeanne Mager Stellman, Steven D. Stellman, Tracy Weber, Carrie Tomasallo, Andrew B. Stellman and Richard Chris-

tian, Jr. A Geographic Information System for characterizing exposure to Agent Orange and other Herbicides in Vietnam, III Environmental Health Perspectives 321(2003); Institute of Medicine, Veterans and Agent Orange: Update 2002 (2002); Institute of Medicine, Veterans and Agent Orange: Update 2000 (2000); Leonard Rivkin & Jeffrey Silberfeld, From Auto Accidents to Agent Orange (2000); Nat'l Veterans Legal Services Program, Self-Help Guide on Agent Orange: Advice for Vietnam Veterans & their Families (2000); Institute of Medicine, Veterans and Agent Orange: Update 1998 (1998); Deborah E. Greenspan, Special Master, *In re "Agent Orange" Product Liability Litigation:* Final Report of the Special Master on the Distribution of the Agent Orange Settlement Fund (1997); Institute of Medicine, Veterans and Agent Orange: Update 1996 (1996); Individual Justice in Mass Tort Litigation (1995); The Legacy of Vietnam Veterans and their Families: Survivors of War: Catalysts for Change: Papers from the 1994 National Symposium (Dennis K. Rhoades ed., 1995); Institute of Medicine, Veterans and Agent Orange: Health Effects of Herbicides Used in Vietnam (1994); Michael Fumento, Science Under Siege: Balancing Technology and the Environment (1993); Ronald E. Gots, Toxic Risks: Science, Regulation, and Perception (1993); Peter H. Schuck, Fashioning a Settlement: Agent Orange on Trial, *in* The Responsible Judge: Readings in Judicial Ethics (John T. Noonan & Kenneth I. Winston, eds., 1993); Michael E. Wildhaber, Veteran's Benefit Manual: An Advocate's Guide to Representing Veterans and their Dependents (1991); Kenneth R. Feinberg, Special Master, *In Re "Agent Orange" Product Liability Litigation:* Report of the Special Master Pertaining to the Disposition of the Settlement Fund (1989); Peter H. Schuck, Agent Orange on

Trial: Mass Toxic Disasters in the Courts (1986); Kenneth R. Feinberg, Special Mastter, *In Re "Agent Orange" Product Liability Litigation:* Report of the Special Master Pertaining to the Disposition of the Settlement Fund (1985); *In Re "Agent Orange" Product Liability Litigation:* Preliminary Memorandum and Order on Settlement (1984); New York State Temporary Commission on Dioxin Exposure, Findings, Conclusions and Recommendations of the New York State Temporary Commission on Dioxin Exposure (1983); Carol Van Strum, A Bitter Fog: herbicides and human rights (1983); Fred Wilcox, Waiting for an Army to Die: The Tragedy of Agent Orange (1983); *Procedural History of the Agent Orange Products Liability Litigation,* 52 Brook. L.Rev. 335 (1986); Jeanne Mager Stellman, Steven D. Stellman, Richard Christian, Tracy Weber and Carrie Tomasallo, *The Extent and Patterns of Usage of Agent Orange and other Herbicides in Vietnam,* 422 Nature 681 (2003); Richard A. Nagareda, *Closure in Damage Class Settlements: The Godfather Guide to Opt–Out Rights,* 2003 U. Chi. L. Forum 141, 156; Joseph M. Guzzardo & Jennifer L. Monachino, *Gulf War Syndrome—Is Litigation the Answer?: Learning Lessons from In re Agent Orange,* 10 St. John's J. Leg. Comment. 673 (1995); Aaron D. Twerski, *With Liberty and Justice for All: An Essay on Agent Orange and Choice of Law,* 52 Brook. L.Rev. 341 (1986); Peter H. Schuck, *The Role of Judges in Settling Complex Cases: The Agent Orange Example,* 53 U. Chi. L.Rev. 337 (1986); Paula Batt Wilson, Note, *Attorney Investment in Class Action Litigation: The Agent Orange Example,* 45 Case W. Res. L.Rev. 291 (1994); Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation,* 86 Northwestern Univ. L.Rev. 643

(1992); Harvey P. Berman, *The Agent Orange Veteran Payment Program,* 53 L. & Contemp. Probs. 49 (1990); Robert L. Rabin, *Tort System on Trial: The Burden of Mass Toxics Litigation,* 98 Yale L.J. 813 (1989) (reviewing Peter Schuck, Agent Orange on Trial: Mass Toxic Disasters in the Court (1987)); Charles Nesson, *Agent Orange Meets the Blue Bus: Factfinding at the Frontier of Knowledge,* 66 B.U. L.Rev. 521 (1986); Paul Sherman, *Agent Orange and the Problem of the Indeterminate Plaintiff,* 52 Brook. L.Rev. 369 (1986).

## B. Agent Orange I

On February 19, 1979, the plaintiffs filed a 162–page complaint on behalf of named and unnamed Vietnam veterans and members of their families who claimed to have been injured as a result of their exposure to various phenoxy herbicides, including Agent Orange. *See Dowd v. Dow Chemical Company,* 79 CV 467 (E.D.N.Y.1979). Plaintiffs alleged, among other things, that defendants negligently manufactured and sold to the government for use in Vietnam herbicides that contained 2,3,7,8 tetrachlorodibenzo-p-dioxin (TCDD or dioxin). Plaintiffs relied on theories of strict liability, breach of warranty, intentional tort and nuisance. According to plaintiffs, the veterans' exposure to dioxin-contaminated herbicides in Vietnam resulted in a wide variety of systemic diseases including soft tissue sarcoma and porphyria cutanea tarda as well as miscarriages to veterans' wives and birth defects in their children.

Similar cases were pending in other jurisdictions. *See, e.g., United States v. Vertac Chemical Corp.,* 489 F.Supp. 870, 876 (E.D.Ark.1980); *Green v. Dow Chem. Co.,* No. 79–651 (N.D.Ill.1979); *Chapman v. Dow Chemical,* No. 79–652 (N.D.Ill.1979); *Citizens Against Toxic Sprays, Inc. v. Bergland,* 428 F.Supp. 908, 914 (D.Or. 1977); R. Bovey & A. Young, *The Science of 2,4,5–T and Associated Phenoxy Herbicides* 134 (1980). All cases were transferred to this district by the Judicial Panel

on Multidistrict Litigation ("MDL Panel") for consolidation of pretrial proceedings. State cases were removed to the federal courts on various theories. Almost 600 cases originally filed in state and federal district courts throughout the country were transferred here for inclusion in this multidistrict litigation, MDL No. 381 (Agent Orange).

There were several actions involving claims by civilians. The civilian plaintiffs included: a proposed class of civilians allegedly exposed to phenoxy herbicides in Vietnam, *Thornton v. Dow*, C–81–005–JLQ (D.Wash.1981); a proposed class of thirty-five thousand civilian residents of the County of Kaui, State of Hawaii, who alleged exposure to Agent Orange and other phenoxy herbicides during a testing program conducted in 1967, *Fraticelli v. Dow*, CV No. 82–0021 (D.Haw.1982); civilian employees of defense contractors who were allegedly exposed to phenoxy herbicides in Vietnam in 1967, *Kjome v. Dow*, CV 83C–3876 (N.D.Ill.1983) and *Vaughan v. Dow*, CV No. 83–1440 (D.Ariz.1983); a medical doctor who served in Vietnam, in the employ of the State Department, *Hogan v. Dow*, CV–R–81–410ECR (D.Nev. 1981); and a civilian employee of a contractor exposed to Agent Orange in 1975, *Lester v. Dow*, CV No. H–80–587 (S.D.Tex. 1980). These and similar actions filed by various civilian plaintiffs were also transferred to this district by the MDL Panel. Civilian cases were ultimately dismissed.

### 1. MDL Panel

Since 1968, section 1407 of title 28 of the United States Code has provided a means for the MDL panel's transfer of related cases pending in different federal district courts to a single district judge for pretrial proceedings. *See* 28 U.S.C § 1407. The savings in time and money when many cases are investigated and prepared together for disposition can be enormous.

Mass tort actions are especially suited to MDL treatment. *See, e.g., In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F.Supp. 1098 (J.P.M.D.L.1992); *In re Air Crash Disaster at Boston, Massachusetts on July 31, 1973*, 399 F.Supp. 1106 (D.Mass.1975); *In re "A. H. Robins Co., Inc., Dalkon Shield" IUD Products Liab. Litig.*, 406 F.Supp. 540 (J.P.M.D.L.1975) (consolidation for pretrial proceedings of actions involving claims for damages arising out of use of intrauterine contraceptive devices); *In re Celotex Corp. "Technifoam" Products Liab. Litig.*, 68 F.R.D. 502 (J.P.M.D.L.1975) (transfer of actions in which plaintiffs claimed fire losses and structural damages as a result of defects in defendant's insulation material).

While a trial in this district of all the Agent Orange cases was once contemplated, the transferee count is not now authorized to try cases transferred from another district by the MDL panel on the basis of that transfer alone. *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998); David F. Herr, *Annotated Manuel for Complex Litigation 3d* at 31.132 (2002). Many MDL cases are, however, still terminated in the transferee court by motion, settlement or on the basis of other forms of transfer.

■ The transferee court has broad powers in matters relating to management of the multidistrict case before it. Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 584 (1978). Once a case has been transferred by the Panel, the transferee court assumes complete jurisdiction for pretrial purposes. It has authority to decide all pretrial motions including dispositive motions such as those for summary judgment or approval of a

settlement. *Id.* at 582. The transferee court is also authorized to handle matters relating to class action certification to prevent inconsistent rulings and to promote judicial efficiency. *See In re Piper Aircraft Distribution System Antitrust Litigation,* 405 F.Supp. 1402, 1403–04 (J.P.M.D.L.1975).

## 2. 1983 Class Certification

In 1983, this court certified a large class of Agent Orange related plaintiffs under Federal Rules of Civil Procedure Rule 23(b)(3) for liability issues, and under Rule 23(b)(1)(B) for punitive damages. *In re "Agent Orange" Prod. Liab. Litig.,* 100 F.R.D. at 118. Five factors were recognized as making the desirability of class certification even greater than it would be in most mass tort litigation. The first was size; plaintiffs' class in the litigation potentially numbered millions. If the claims were dealt with individually the result might have "result[ed] in a tedium of repetition lasting well into the next century." *In re No. Dist. of Cal. "Dalkon Shield" IUD Prod. Liab. Litig.,* 526 F.Supp. 887, 894 (N.D.Cal.1981), *rev'd,* 693 F.2d 847 (9th Cir.1982), *cert. denied sub nom. A.H. Robins v. Abed,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Second, was the need to assure that the financial burden would ultimately fall on the parties which should, as a matter of fairness, bear it. Third, certification would encourage settlement of the litigation; in a situation where there are potentially tens of thousands of plaintiffs, the defendants may naturally be reluctant to settle with individual claimants on a piecemeal basis. Fourth, a global settlement would permit a sharp reduction of transactional costs. Fifth, a reasoned, fair and economical scheme to administer the recovery settlement would permit swift and effective assistance to veterans and their families.

## 3. Class and Notice

In 1983, the court defined the class as:

those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange or other phenoxy herbicides, including those composed in whole or in part of 2, 4, 5–trichlorophenoxyacetic acid or containing some amount of 2, 3, 7, 8–tetrachlorodibenzo–p–dioxin. The class also includes spouses, parents, and children of the veterans born before January 1, 1984, directly or derivatively injured as a result of the exposure.

*In re "Agent Orange" Prod. Liab. Litig.,* 100 F.R.D. at 729.

Personal notice was mailed to several hundred thousand persons. The largest group represented names on file at the Veterans Administration Agent Orange Registry. A copy of the class order and notice was also sent to the governors of each of the states asking that the notice be referred to the appropriate state organizations dealing with Vietnam veterans. Cooperation was excellent. Many states gave wide circulation to the notice and others provided a list of names and addresses so the notice could be mailed to those veterans.

A court-approved announcement on nationwide television networks and on radio stations with a combined coverage of at least fifty percent of the listener audience in each of the top 100 radio markets was circulated. The text of that notice can be found in 100 F.R.D. at 734. The class notice was also published in three national general circulation newspapers and magazines and six veterans' magazines. Notice was directed to be sent to the ten largest circulation newspapers in Australia and the five largest circulation newspapers in

New Zealand. The text of the newspaper and magazine notice can be found at 100 F.R.D. at 734–35. Informal notice through the news media was widespread. Plaintiffs were authorized to arrange a toll-free telephone number. Callers were to be told where to write to obtain more information concerning the litigation. Those requesting a copy of the notice mailed to class members were sent one. A large number of people called the toll-free number.

### 4. Settlement

Plaintiffs were represented by highly skilled and aggressive attorneys. Defense counsel were also adroit. Negotiations on behalf of present and potential future plaintiffs was intense.

Defendants agreed to pay $180 million (the "Settlement Amount") in full and final settlement of all claims for compensatory damages against them, and their foreign and domestic predecessors, successors, parents, subsidiaries, affiliates and insurers, as well as any of their stockholders, directors, officers, employees and agents, that arose out of or were based on, or could have in the future arisen out of or have been based on, any of the matters alleged in the complaint. All amounts paid by defendants were placed into a fund (the "Fund") established, maintained and administered by this court. The Fund was under the Court's continuous jurisdiction, control and supervision to assure that it earned the maximum interest consistent with safety and that all disbursements were properly made. The sum, at the time, was unprecedented. *See, e.g.,* Ralph Blumenthal, *Veterans Accept $180 Million Pact on Agent Orange,* N.Y. Times, May 8, 1984, at A1. Because of high interest rates and investment policies, the total Fund ultimately grew to some $330 million.

Claims against the Fund were the exclusive remedy of all Class members arising out of or relating to, or in the future arising out of or relating to, the subject matter of the Complaint. The settlement required the setting aside of $10 million of the $180 million to indemnify the defendants from any judgments obtained in state court actions by members of the class alleging harm caused by exposure to Agent Orange in or near Vietnam. Any part of the indemnity fund not used was to revert to the benefit of the class members. This $10 million was subsequently combined with the rest of the Fund with the consent of defendants.

The Class specifically included persons who had not yet manifested injury. All persons who were otherwise qualified but who had previously requested exclusion from the Class had the opportunity to withdraw their exclusion (opt back in) within a reasonable time as determined by the court. As administered, all those who opted out of the class in effect had the option of reentering the class at any time since any veteran or veteran's family was not asked what their position had been in the litigation when applying for help from the Fund.

### 5. Post Settlement

Following the settlement, the court held extensive hearings on fairness and adequacy in New York, Chicago, Houston, Atlanta and San Francisco. Some 500 witnesses were heard. The court considered hundreds· of additional written communications from veterans, members of their families, veterans' organizations, and others. In September of 1984 the court issued a preliminary memorandum and order · approving the settlement as fair, reasonable and adequate. *In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. 740 (E.D.N.Y. 1984) (Preliminary Memorandum and Or-

der on Settlement). After the further determinations required by that order were made—the plan for distribution to eligible class members and the amount of reasonable attorneys' fee awards to plaintiffs' attorneys—final approval of the settlement was granted. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1396 (E.D.N.Y. 1985) (Memorandum, Order and Judgment on Distribution of the Settlement Fund), *aff'd in part, rev'd in part*, 818 F.2d 179 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1296 (E.D.N.Y. 1985) (Memorandum and Order on Attorney Fees as Modified and Final Judgment), *aff'd in part, rev'd in part*, 818 F.2d 216 (2d Cir.1987); 818 F.2d 226 (2d Cir. 1987), *cert. denied sub nom. Newton Schwartz v. Dean*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

### a. Dismissal of Opt–Out Claims

After the court preliminarily approved the Settlement Agreement, most of the original 2,500 opt-outs chose to come back into the class with the court's permission. Two hundred and eighty-two service persons did not. *See In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. at 1230. Their claims were embodied in seventeen different cases.

Summary judgment was granted against each opt-out plaintiff on the grounds, *inter alia*, that none could prove by the probability demanded in tort litigation that his or her ailment was caused by Agent Orange, *see* 611 F.Supp. at 1260–63; 611 F.Supp. at 1284–85, and that all the claims were barred by the military contractor defense. *See* 611 F.Supp. at 1263–64; 611 F.Supp. at 1285. As already noted, those dismissed plaintiffs were nonetheless permitted by the court to obtain full benefits from the Fund.

### b. Appeals

Appeals were taken from numerous orders including the orders certifying the class action, approving the settlement, outlining the distribution plan, awarding counsel fees, granting summary judgment against the opt-out claimants, dismissing untimely claims, dismissing all the claims against the United States, and unsealing discovery materials.

In nine unanimous opinions dated April 21, 1987 a panel of the Second Circuit Court of Appeals disposed of all of the numerous individual appeals except those from the order of the district court providing for public access to documents sealed from public view during the discovery phase of the litigation. Following the denial of several petitions for rehearing and for rehearing *en banc*, six petitions for writs of certiorari were filed with the Supreme Court by the opt-out plaintiffs, by class members who objected to the settlement and distribution, by other plaintiffs whose claims were dismissed, and by one of the plaintiffs' attorneys who sought reversal of the appellate court's rulings on counsel fees. The petitions for writs of certiorari were all denied by the Supreme Court. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir.1987) (affirming class certification and approving of settlement), *cert. denied sub nom. Pinkney v. Dow*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988), and *Krupkin v. Dow*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); 818 F.2d 179 (2d Cir.1987) (approving Payment Program but rejecting Class Assistance Foundation); 818 F.2d 187 (2d Cir.1987) (affirming summary judgment entered against opt-out plaintiffs on ground of government contractor defense), *cert. denied sub nom. Lombardi v. Dow*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); 818 F.2d 194 (2d Cir. 1987) (affirming dismissal of Federal Tort

Claims Act claims of servicemen and their relatives against the United States, on the grounds that they are barred by the *Feres* doctrine and by the discretionary function exception to the Federal Tort Claims Act); 818 F.2d 201 (2d Cir.1987) (affirming dismissal of "direct" claims against United States brought by wives and children of servicemen, on *Feres* grounds), *cert. denied sub nom. Adams v. United States,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); 818 F.2d 204, 98 L.Ed.2d 647 (2d Cir.1987) (affirming dismissal of claims of "Agent Orange" manufacturers against United States for contribution and indemnity for the class action settlement payments); 818 F.2d 210 (2d Cir.1987) (affirming dismissals of Hawaiian civilians' actions against the United States and the chemical companies), *cert. denied sub nom. Fraticelli v. Dow,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); 818 F.2d 216 (2d Cir.1987) (rejecting plaintiff class' attorneys' fee-sharing agreement and reinstating fee award determined by district court), *cert. denied sub nom. Newton Schwartz v. Dean,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987), 818 F.2d 226 (2d Cir.1987) (approving district court's calculations of attorneys' fee awards, with abrogated award reinstated), *cert. denied sub nom. Newton Schwartz v. Dean,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

In an opinion dated June 10, 1987, a separate panel of the Court of Appeals for the Second Circuit affirmed the district court's order unsealing materials produced or generated during discovery in the Agent Orange litigation; defendants filed a petition for writ of certiorari with the Supreme Court, which was denied on November 17, 1987. *In re "Agent Orange" Prod. Liab. Litig.,* 104 F.R.D. 559, 562 (E.D.N.Y. 1985) (Magistrate's Pretrial Order No. 33, dated December 17, 1984) ("Protective Orders Opinion"), *aff'd,* 821 F.2d 139 (2d Cir.1987), *cert. denied sub nom. Dow v. Ryan,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987).

### 6. Plan for Distribution

After additional formal hearings, the court adopted (with slight revision) a plan of distribution prepared by Special Master Kenneth R. Feinberg after consultation with the court; it took into account the suggestions from various veteran advisors. *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1396 (E.D.N.Y.1985), *modified,* 818 F.2d 179 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932, *and modified,* 689 F.Supp. 1250 (1988). The plan specified two mechanisms for the distribution of the Fund to the class members residing in the United States.

First, it provided for distribution of cash payments to individual veterans based generally on the severity of the veteran's medical condition or death (along with other factors). The objective of the cash payment program was to provide prompt financial benefits to those most in need.

Second, it leveraged Fund assets for the benefit of families of the veterans through the establishment of a grant-making "foundation." The foundation was to provide initial funding for organizations to provide services and benefits specifically targeted to the needs of the class, including, particularly, the children of the veterans. The hope was that through education and provision of directed funding the foundation (1) would create a lasting legacy for the Vietnam veteran community by institutionalizing a services support network directed at the needs of the population of Vietnam veterans and their families, and (2) establish a basis for the government's recognizing the possible impact of Agent Orange on children and families of the veterans.

Both these hopes have been substantially realized.

The United States Court of Appeals for the Second Circuit stayed implementation of the distribution plan pending the resolution of appeals. Finally, on April 21, 1987, this court's decisions certifying the class, finding the settlement to be fair, reasonable and adequate, and adopting the distribution plan (with modification) were affirmed. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179 (2d Cir.1987) (grant-making to be directly controlled by the court).

#### 7. Distribution of the Settlement Fund

As of June 30, 1997 the Fund had all been distributed or committed for the benefit of the class of plaintiffs in accordance with the plan of distribution approved by the court. The Final Report on the distribution of the Fund was issued in September of 1997.

During the course of the nine-year distribution of approximately $330,000,000, the Fund provided $267,901,842.66 (consisting of $196,595,084.66 through the Agent Orange Veteran Payment Program and $71,306,758 through the Agent Orange Class Assistance Program) to and for the benefit of some 291,000 class members associated with the United States armed forces in the form of either direct cash payments or provision of services. An additional $692,834.70 was distributed by the New Zealand Agent Orange Trust to and for the benefit of class members in New Zealand, and $7,086,684 was distributed by the Australian Vietnam War Veterans Trust to and for the benefit of Vietnam veterans in Australia. A total of $2.7 million was being distributed to veterans or for their benefit when the program ended. The remainder was used to pay attorney's fees and transactional expenses. *See* Final Report at 3.

#### C. Agent Orange II

In 1989 and 1990, two overlapping class actions, *Ivy v. Diamond Shamrock Chemicals Co.* and *Hartman v. Diamond Shamrock Chemicals Co.*, were brought in Texas courts. *See Ryan v. Dow Chemical,* 781 F.Supp. 902 (E.D.N.Y.1991). The two actions described in *Ryan* were, in effect, direct challenges to the validity of the settlement and the programs financed by the Fund. Those plaintiffs, who were class members, sued the same chemical companies who were defendants in the original Agent Orange litigation on the same grounds and for the same relief as was originally sought and compromised in the class action. If plaintiffs were successful, they would have automatically reduced the sums available for other class members, since the terms of the settlement set aside $10 million for indemnification of the defendants against suits of that kind.

The cases presented the question of whether members of a class whose action was brought and was still pending in federal court could circumvent the effect of a federal judgment by bringing new actions in a state court, relying exclusively on state law. The need to protect other class members, the importance of maintaining the class action as viable litigation device, and the interest of all litigants in the finality of settlements required that the question be answered in the negative.

At the heart of these lawsuits was plaintiffs' belief that it was unfair to bind them to the settlement because the latency of their injuries prevented them from knowing definitively whether or not they were included in the class at the time of the first deadline for opting out of the Agent Orange class action. This court held that they were in fact bound. *In re "Agent*

*Orange" Prod. Liab. Litig.*, 618 F.Supp. at 625, *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647. *See also, Kane v. Johns–Manville Corp.,* 843 F.2d 636, 638–639 (2d Cir.1988) (affirming reorganization plan that binds future claimants with no present injuries). Nevertheless, plaintiffs' argument raised significant considerations of justice.

All of the courts which considered the Agent Orange Settlement were fully cognizant of the conflict arguments hypothesized by the plaintiffs in this second wave of complaints. They took steps to minimize the problem in the way they arranged for long-term administration of the Settlement Fund. In many cases the conflict between the interests of present and future claimants was insignificant. Those plaintiffs, like all class members who suffered death or disability before the end of 1994, were eligible for compensation from the Settlement Fund. The relevant latency periods and the age of the veterans ensured that almost all valid claims would be revealed before that time. As veterans become older and diseases of their peer non-veteran group are more and more common, it is less and less likely that a connection of the disease for a particular veteran to Agent Orange can be proved to any substantial degree of probability through epidemiological or other scientific techniques. In addition, the generous government V.A. programs for allowing Agent Orange disabilities on the most tenuous statistical bases for many diseases ensures that those who learn of their disease long after service in Vietnam will be compensated by disability and other payments for their lifetime as service-connected disabled persons. This government program was adopted after the Agent Orange private Fund was established. Accepting benefits from either the private Fund or the V.A.

program did not disqualify a claimant from the other remedy.

This court ultimately held that, except for overseeing the expenditure of the Settlement Fund to ensure that it did the greatest possible good for the veterans and their families, the court could do nothing more for plaintiffs in the second wave of complaints. The Court of Appeals for the Second Circuit upheld the decision, stating that "victims with no visible symptoms, were included in the plaintiff class." *In re "Agent Orange" Prod. Liab. Lit.,* 996 F.2d 1425, 1434 (2d Cir.1993).

The Court of Appeals' 1993 opinion was believed to have effectively closed the door to claims against manufacturers of Agent Orange. From 1993 to the commencement of the instant litigation, the spigot of litigation that had gushed since the early 1980s slowed considerably. For published opinions dating from 1993, see, for example, *Miller v. Diamond Shamrock Co.,* 275 F.3d 414 (5th Cir.2001) (civilian workers' claims were barred by the military contractor defense); *Winters v. Diamond Shamrock Chem. Co.,* 149 F.3d 387 (5th Cir.1998) (holding that removal was proper under Federal Officer Removal Statute and that claims were barred by statute of limitations); *In re "Agent Orange" Prod. Liab. Lit.,* 1999 WL 1045197 (E.D.N.Y. 1999) (barred by statute of limitations).

D. Agent Orange III, the Instant Litigation

Plaintiffs in a third wave of litigation now contend that their diseases became known to them after the Settlement Fund was expended.

1. District Court

In August of 1998, the Isaacsons began this latest group of Agent Orange cases with the filing of a suit in New Jersey state court, asserting only state law claims.

Defendants removed the case to federal court. Isaacsons' motion to remand was denied by the District Court in New Jersey. Thereafter, the case was transferred to this court by the MDL Panel.

The Stephensons filed their suit pro se in the United States District Court for the Western District of Louisiana in February of 1999. Soon thereafter they obtained counsel. Defendants were granted an order by the MDL Panel, transferring the case to this court. The Isaacson and Stephenson cases were consolidated for pretrial proceedings by this court.

Defendants moved in this court to dismiss the complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They argued that plaintiffs' claims were barred by the 1984 class settlement and subsequent final judgment. The motion was granted. This court concluded that the suit was an impermissible collateral attack on the prior settlement.

A number of other similar cases are now pending in this court. *See Schuckman v. Dow Chemical Co.*, No. 03–02120 (E.D.N.Y. filed May 2, 2003); *Skinner v. Dow Chemical Co.*, No. 03–02935 (E.D.N.Y. filed June 9, 2003); *Kidd v. Dow Chemical Co.*, No. 03–05047 (E.D.N.Y. filled Oct. 2, 2003); *Anderson v. Dow Chemical Co.*, No. 03–05227 (E.D.N.Y. filed Oct. 17, 2003); *Gallagher v. Dow Chemical Co.*, No. 03–05875 (E.D.N.Y. filed Nov. 11, 2003); *Stearns v. Dow Chemical Co.*, No. 03–05965 (E.D.N.Y. filed Nov. 7, 2003); *Breaux v. Dow Chemical Co.*, No. 03–05966 (E.D.N.Y. filed Nov. 7, 2003); *Breaux v. Dow Chemical Co.*, No. 03–05967 (E.D.N.Y. filed Nov. 25, 2003); *Gallagher v. Dow Chemical Co.*, No. 03–05970 (E.D.N.Y. filed Nov. 25, 2003). Calls to the Clerk's office indicate that hundreds of additional such cases can be expected to be filed shortly.

2. Appeals

The Second Circuit Court of Appeals reversed this court's holding that the instant suits constituted an impermissible collateral attack on the settlement, but it upheld the District Court's jurisdiction over Isaacson under the All Writs Act. *Stephenson v. Dow Chemical Co.*, 273 F.3d 249 (2nd Cir.2001), *aff'd in part, vacated in part by Dow Chemical Co. v. Stephenson*, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003).

The Court of Appeals held that plaintiffs' suits could proceed because there had been no "prior adequacy of representation determination with respect to individuals whose claims [arose] after the depletion of the settlement fund." *Id.* at 258. Both Stephenson and Isaacson fell within the class defined in the 1984 settlement, but their alleged injuries allegedly did not manifest themselves until after the Settlement Fund had been expended. The Court of Appeals found that there was an apparent conflict between plaintiffs and the class representatives because the litigation addressed all future claimants, but only provided recovery for those whose injuries were discovered prior to 1994. It believed that under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), plaintiffs were not adequately represented in the prior litigation and could not be bound by the 1984 class settlement without violating their rights to due process.

On appeal to the Supreme Court of the United States, an equally divided court affirmed the Court of Appeals decision as to the collateral attack on the prior settlement. *Dow Chemical v. Stephenson*, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (per curiam). It vacated the deci-

sion with respect to jurisdiction under the All Writs Act. *Id.*

The Court of Appeals for the Second Circuit remanded the cases for further proceedings consistent with its 2001 opinion and the decision of the Supreme Court. *Stephenson v. Dow Chemical Co.*, 346 F.3d 19 (2d Cir.2003). This court now addresses the merits of plaintiffs' claims on defendants' motion for summary judgment. Other aspects of these cases raising jurisdictional and amendment issues will be treated in separate memoranda.

### III. Facts as to Government Contractor Defense

The facts supporting the government contractor defense are the same for each of the defendants. They are set forth in the extensive contractual and other documents consisting of many hundreds of pages supporting each defendant's motion. The statements below are based primarily on the affidavit and documents submitted on behalf of Diamond Shamrock Corporation (Diamond) which parallel those submitted on behalf of other defendants, and the affidavit and documents submitted on behalf of all defendants.

### A. Orders from Government

From 1951 until July 1969, Diamond manufactured at Newark, among other materials, the phenoxy herbicides 2,4–dichlorophenoxyacetic acid ("2,4–D") and 2,4,5–trichlorophenoxyacetic acid ("2,4,5–T"). Diamond also manufactured at Newark trichlorophenol ("TCP"), the intermediate used to produce 2,4,5–T. It prepared the TCP in a heated autoclave using the starting ingredient 1,2,4,5–tetrachlorobenzene ("TCB").

Commencing in 1961 and continuing through 1968, Diamond produced and delivered Agent Orange to the United States pursuant to contracts entered into with the Defense General Supply Center, the Defense Fuel Supply Center, the United States Army or the United States Air Force. The Contracts set forth or incorporated by reference detailed specifications for the Agent Orange to be supplied to the Government and the 2,4–D and 2,4,5,-T the product contained. Those specifications were promulgated by the Government. Diamond fully complied with them. In addition, Diamond conducted all inspections and tests on Agent Orange, 2,4,-D and 2,4,5–T that were required pursuant to those specifications. Compliance with the government's specifications were certified by government inspectors in Material Inspection and Receiving Reports.

The contracts contained, or were treated as if they contained, a "DO–C9e" rating assigned to it by the United States pursuant to the Defense Production Act of 1950, as amended, 50 U.S.C.App. § 2061 *et. seq.*, and the regulations promulgated under the Act. The ratings required delivery to help prosecute the military actions of this country in Vietnam and provided the means to obtain scarce materials and equipment to produce Agent Orange.

By September 1966, the United States had determined that the Air Force's requirements for Agent Orange exceeded total domestic production capacity, and that available quantities were insufficient to meet the Air Force's remaining requirements for fiscal year 1967. The United States' procurement of Agent Orange was by this time on an "emergency basis."

The problem of insufficient production capacity was exacerbated by a shortage of TCB, the starting ingredient needed for the production of TCP. Diamond relied on Hooker Chemical Corporation for its TCB supplies. By September 1966, Diamond was unable to produce at full capacity because of a TCB shortage. In November

1966, the Department of Commerce advised Diamond that the United States would require "the maximum capacity of Diamond's production of 2,4,5–T acid."

In December 1966, the Military Assistance Command, Vietnam ("MACV") advised the Commander–In–Chief, Pacific ("CINCPAC") that the United States' projected shortage of Agent Orange was of immediate operational concern to MACV, that the value of herbicide operations in Vietnam had been proven, and that a failure to obtain needed supplies would cause an unacceptable impact on military operations. MACV accordingly requested that the United States investigate the possibility of plant expansion or diversion of product from commercial uses to bolster supplies.

In connection with the United States' consideration of whether to build its own facility for the production of Agent Orange, representatives of Edgewood Arsenal inspected Diamond's production operations at Newark in December 1966. The Director of the Office of Emergency Planning of the Executive Office of the President notified Secretary of Defense Robert McNamara on March 10, 1967 that "the Administrator, Business and Defense Services Administration is currently instituting procedures to insure that the entire output of the chemical 2,4,5–T, which is the limiting component in the production of 'Orange,' will be used on military orders."

On March 24, 1967, the Department of Commerce's Business and Defense Services Administration ("BDSA") directed Diamond, pursuant to Section 101 of the Defense Production Act of 1950, to accelerate delivery of its existing DO-rated orders for Agent Orange to a monthly rate of 30,600 gallons beginning April 3, 1067, and to a rate of 51,100 gallons once a projected expansion of the Newark Plant was completed in the Fall of 1967. The monthly delivery rates set forth in this directive (the "Directive") represented 100% of the Newark Plant's production capacity for 2,4,5–T, the limiting component in the manufacture of Agent Orange.

The Directive also required Diamond to provide BDSA with a monthly report of production, total shipments, shipments against rated orders, and end of month inventory of 2,4,5,-T and 2,4–D. In addition, the Directive stated that:

> Your requirements for tetrachlorobenzene may be obtained by placing DO rated orders on your supplier. We have informed the Hooker Chemical Corporation of your need for 150,000 pounds per month beginning April 3, 1967, with the understanding that these shipments will be at the rate of approximately 100,000 pounds each twenty days due to the capacity of the facilities used to transport material to your plant. * * * If you encounter any difficulty in obtaining your needs of raw materials, please let me know immediately.

The United States also mandated that Hooker Chemical supply the crucial starting ingredient, TCB, only to companies producing Agent Orange. Diamond was able to obtain TCB only because it was using the TCB exclusively for the production of Agent Orange. Thus, even assuming arguendo that Diamond had the opportunity under the Defense Production Act to refuse to accept the Directive, as a practical matter such an opportunity would have been meaningless: Diamond would have been forced to close its Plant because the United States controlled all access to the starting ingredient needed for production of any 2,4,5–T.

The United States, simultaneous with its Directive requiring Diamond to accelerate delivery of Agent Orange, acted to increase Diamond's Agent Orange production capacity. In February 1967, the De-

partment of Commerce provided Diamond a "DO–D4" priority rating to obtain equipment and material needed for the Newark Plant expansion. All purchase orders for this project contain the statement that "the material on this order carries a rating of DO–D4 certified for National Defense Use under BDSA–Regulation 2, Case 30440." Representatives of the Defense General Supply Center actively interceded on behalf of Diamond to assist in obtaining equipment needed for the Plant expansion.

In April 1967, the Department of Commerce telephoned the Operations Manager of Diamond's Agricultural Chemicals Division, to relay "serious concern about the delay in starting up the converted D facilities to produce T Acid." In May 1967, the BDSA assured Diamond that it would assist in obtaining any 2,4–D needed by Diamond while awaiting installation of its new 2,4–D equipment. The BDSA also directed that if Diamond completed its Plant expansion earlier than anticipated, and therefore achieved higher rates of 2,4,5–T production, all of it must be formulated into 'Orange' and shipped to the Department of Defense pursuant to Section 101 of the Defense Production Act. In May 1967, the United States directed that Diamond treat as "classified" all information concerning Agent Orange production.

Effectively, the United States commandeered the Newark Plant pursuant to the Defense Production Act for use in the national defense effort. The government mandated that the Newark Plant produce 2,4,5–T exclusively for use in the production of Agent Orange, prohibited the sale of 2,4,5–T to private customers, closely monitored production activity, required Diamond to account for production and inventory levels, controlled access to the crucial starting ingredient, TCB, permitted TCB deliveries only for use in making Agent Orange, ordered Diamond to accelerate deliveries of Agent Orange, and acted to increase the Newark Plant's production capacity by helping to obtain, and assigning a priority rating to, material and equipment needed for the Plant expansion. It closely supervised production and tested the Agent Orange delivered to ensure that it complied with specifications.

Plaintiffs complain that some of the many contracts are missing or illegible. This is to be expected in this by now ancient case. It does not matter since the contracts and other documents are repetitive and redundant. The product of each of the manufacturers was mixed and expended in a way that makes it impossible to now determine whose Agent Orange actually touched which plaintiff when, if at all. Plaints of plaintiffs' counsel that it is difficult to obtain old documents concerning Agent Orange from the National Archives are not compelling; all the evidence relevant to this motion has been available from the beginning from this court's files which could have been recalled from storage for ease in research by the parties and courts. No new data from the current files would change the facts critical to the contractor's defense.

B. Awareness by Government of Dangers

The herbicidal properties of 2,4–D and 2,4,5–T as a munition were discovered in research conducted by the United States military during World War II. During the 1950s and 1960s, the United States armed forces developed these compounds as weapons of war, conducting extensive testing and experimentation involving applications of high concentrations of these materials at heavy rates to defoliate large areas indiscriminately as rapidly as possible.

By 1949, the United States Public Health Service ("PHS") investigated cases of the skin condition chloracne possibly caused by dioxin at Monsanto's 2, 4, 5–T plant in Nitro, West Virginia. During the

1950s and 1960s the PHS developed considerable expertise on dioxin's toxicity; chloracne developed by persons exposed to high levels of dioxin; and dioxin's potential presence as an unintended by-product in the production 2,4,5–T. (Caley Aff. Ex. 18 at 35–39.)

In the early 1950s, scientists at the Army Chemical Corps Chemical Warfare Laboratories located at Edgewood Arsenal, Maryland ("Edgewood") had learned of a toxic by-product in the manufacture of 2,4,5–T. By 1959, many Edgewood scientists knew that dioxin was that toxin and was associated with chloracne. (Gordon Supp. Aff., Ex 7.)

Early in the 1960s, Edgewood personnel, on orders from the White House, investigated the toxicity and potential dangers of 2,4,5–T and 2,4–D, thoroughly reviewing the existing literature and data. (Caley Aff., Ex. 18 at 18–19.) The military scientists at the Chemical Warfare Laboratories at Edgewood Arsenal were evaluating 2,3,7,8–tetrachlorodibenzo–p–dioxin ("TCDD" or "dioxin") as a potential chemical warfare agent. They had learned in 1957 of an outbreak of chloracne in a German chemical plant manufacturing 2,4,5–tricholorophenol, the principal raw material used in the manufacture of 2,4,5–T, and had reviewed an article published by Kimmig and Schultz identifying small quantities of dioxin as the cause of the occupational injury to the workers. (Caley Aff., Ex 18 at 8–9.)

During the early 1960s, the United States conducted experiments with many herbicides, including 2,4,5–T and 2,4–D, to devise formulae specifically for military use in Southeast Asia. Based on these experiments, the United States developed several phenoxy herbicides, including "Agent Orange" (approximately 50% the n-butyl ester of 2,4–D and 50% the n-butyl ester of 2,4,5–T), "Agent Pink" (approxi-

mately 60% the n-butyl ester of 2,4,5–T and 40% the iso-butyl ester of 2,4,5–T), and "Agent Purple" (approximately 50% the n-butyl ester of 2,4–D, 30% the n-butyl ester of 2,4,5–T, and 20% the iso-octyl ester of 2,4,5,-T). The United States' phenoxy herbicide specifications are collectively referred to as "Agent Orange" for purposes of this memorandum.

In the early 1960s, personnel at Edgewood, on orders from the White House, investigated the toxicity and potential dangers of 2,4,5–T and 2,4–D, thoroughly reviewing the existing literature and data. The President's Science Advisory Committee (PSAC), an organization within the White House, was briefed by the military on the Vietnam defoliation program and learned of dioxin as a contaminant in Agent Orange.

At the time it developed its specifications for Agent Orange, the United States knew that 2,3,7,8–tetrachlorodibenzo–p–dioxin ("dioxin") was at the time formed as a by-product during the manufacture of TCP, the intermediate used to produce 2,4,5–T, and that dioxin was also present in 2,4,5–T. It also knew that dioxin was believed to be toxic.

Throughout the time period that Diamond and the other defendants produced Agent Orange for the United States, the government knew that dioxin was being produced during the manufacture of TCP, that dioxin was also present in 2,4,5–T, that it was present in Agent Orange as produced by Diamond and each of the other defendants, and that dioxin was toxic. The United States knew from its own experiments and decisions on whether to constructs own plants, or to use existing private sources, that production of Agent Orange invariably resulted in some dioxin being present in Agent Orange, and that there was a risk that dioxin was carcinogenic and might cause other diseases. Its

knowledge and information was at all times greater than that of defendants.

In 1963, the Institute for Defense Analyses reported to the Department of Defense that herbicides such as 2,4–D and 2,4,5–T were safe when used commercially "in quite dilute solutions," but could be hazardous to health and to military operations because of their use in overkill concentrations by less experienced personnel under the pressure to act quickly in a military environment. Nevertheless, the government determined that "extremely high dose rates" of undiluted herbicides were required for effective military use. (Gordon Opp. Aff., Ex. 7 at ¶¶ 7–9; Reply Affidavit of Michael M. Gordon in Support of Motion for Reargument of Memorandum and Order of Remand (Jan. 29, 1992), Ex. 19 at ¶ 7.)

The PSAC reviewed and approved the military plans for the Vietnam defoliation program in 1963. The presence of dioxin as a possible toxic contaminant in Agent Orange was discussed by various members of PSAC in 1963, 1965, and at other times. (Caley Aff., Ex. 18 at 28.) While one of the persons involved in those discussions was Dr. Melvin Calvin, a winner of the Nobel prize in chemistry, who at the time was a member of the Board of Directors of the Dow Chemical Company, the government itself conducted its own toxicological tests before proceeding with an operational defoliation program in Vietnam. Dr. Bernard McNamara, one of the military scientists involved in the evaluation of dioxin at Edgewood Arsenal, conducted the military's toxicity testing to evaluate the safety of Agent Purple (with apparently somewhat the same dioxin content as Agent Orange) for use in Vietnam in 1963. (Caley Aff., Ex. 18 at 12–14.)

An analytical method of measuring dioxin levels directly in Agent Orange was not available until the early 1970s. In early part of the 1960s, a bioassay known as the rabbit ear test was available to detect the presence of low levels of chloracnegens of any kind in the process. In the middle part of the decade, the analytical method was improved so that it was capable of measuring dioxin content in trichlorophenol, the intermediate used to produce 2,4,5–T. Amounts of dioxin lower than 1 ppm, however, could not be detected using this analytical method. But, 2,4,5–T manufactured from trichlorophenol containing no detectable dioxin using this analytical method would be expected also to contain less than 1 ppm dioxin. Samples of Agent Orange produced by various manufacturers in the 1960s were analyzed in 1972 using a newly developed more sensitive analytical method. Samples of dioxin detected ranged from 0.05 ppm to 47 ppm. As time went on, the capability of measuring dioxin was increasingly refined so that almost infinitesimally small amounts could be detected—and are now discovered widely in the atmosphere. *See* U.S. Environmental Protection Agency, *Information Sheet 1, Dioxin: Summary of the Dioxin Reassessment Science,* May 25, 2001.

In connection with the government's 1967–68 contemplated project to build its own Agent Orange manufacturing plant at Weldon Springs, Missouri, the government considered and worked with information regarding cases of chloracne in the manufacture of 2,4,5–T, the toxicity of dioxin, dioxin's presence in Agent Orange, and the manufacturing process of Agent Orange. The government learned of factors in the manufacturing process which it believed affected the amount of dioxin created in the manufacturing process and included a section titled "DIOXIN" in the draft manual for operations of the government plant. (Caley Aff., Ex 18 at 45–46.) The government believed that it could develop a new technology that would reduce, control or

prevent the formation of dioxin. Its interest in controlling the formation of dioxin was chiefly related to steps needed to protect the health of plant employees and to limit explosions during the manufacturing process. The government's proposed Agent Orange plant was cancelled before it was due to begin production.

The government also was aware that in merchandising similar herbicides the manufacturers typically produced a much diluted version and labeled the product with warnings as to exposure. Nevertheless, the manufacturers were ordered to deliver the product at full strength in barrels essentially unmarked except for the orange stripe on each barrel. The government neither informed the defendants of the way it would use their product or of any precautions it would take in utilizing Agent Orange in the field. The manufacturers had no control over warnings, use or precautions.

Prior to 1965, the Air Force's Environmental Health Laboratory, under the direction of Dr. Walter W. Melvin Jr., performed a series of evaluations of the effects of 2,4,5–T. Even before these studies, Dr. Melvin knew of an association between chloracne and the production of 2,4,5–T, and knew that dioxin was the chloracnegen produced in the manufacture of 2,4,5–T. In the summer of 1966, both the Office of the Army Surgeon General and the Navy's Bureau of Medicine and Surgery requested and received from the National Academy of Sciences toxicity information on 2,4,5–T. In connection with the government's proposed project to establish its own Agent Orange production facility at Weldon Springs, Missouri, the government carefully considered all available information regarding cases of chloracne in the manufacture of 2,4,5–T, the toxicity of dioxin

and dioxin's presence in Agent Orange as produced by defendants.

A government-sponsored study by the Bionetics Research Laboratories, that was begun in 1963 and completed in 1968, first suggested an association between exposure to large doses of 2,4,5–T and possible teratogenic effects in laboratory animals. It was as a result of this government study, and other information available only to the government, that a temporary ban on the use of Agent Orange in Vietnam was announced by the government in April 1970. That ban was made permanent in December 1970.

Knowledge possessed by the government—albeit somewhat speculative as to the actual hazard, if any, posed by Agent Orange as it was used in Vietnam—was far greater than that possessed by defendants. There was never a period when defendants possessed as much knowledge as the government of the dioxin content of Agent Orange and of its dangers as it was used in Vietnam.

C. Designation by Government of Specifications

Formal military specifications and purchase descriptions for 2,4,5–T and 2,4–D and Agent Orange were prepared and promulgated by the government. The government also strictly and precisely defined the markings that were to be placed on drums of Agent Orange supplied by defendants, prohibiting the placement of warnings on the drums by any defendant. The government did not specify the details of the manufacturing process to be utilized by defendants; it was, however, fully aware of the process that would be used, including the resulting dioxin elements.

Having all this superior knowledge of dangers, the government compelled defendants to supply Agent Orange meeting government specifications until late 1969

through government directives, pursuant to Section 101 of the Defense production Act of 1950. It commandeered United States industry's entire capacity to manufacture 2,4,5–T, ordering defendants to accelerate the delivery of Agent Orange. It specified the contents, packaging and method of delivery of the Agent Orange it compelled defendants to produce for the war effort. It required that there be no warnings on the Agent Orange containers delivered by defendants.

The government insisted on defendants' essentially abandoning their private commercial production and sale of a variety of diluted types of herbicides for the undiluted one developed and ordered by the government. The specifications were the government's, not defendants. The United States armed forces accepted the dangers it was aware of because, from a military point of view, the benefits in potential savings of the lives of members of our armed forces and those of our allies outweighed the possible risks. Only late in the hostilities was information available to the government, but not the defendants, together with geopolitical considerations, powerful enough to lead to termination of the Agent Orange program.

Warnings of contents or possible toxicity were not permitted by the government. *See, e.g.,* attached to affidavit of Michael M. Gordon: DA 30–070–CM1,–1635, N.Y. 2–6 ("*Marking;* a pale pink band, 3 inches wide, shall be painted around the center of the drums. There shall be no other identification as to contents or manufacturing origin, with the exception of lot number identification."); DS 00004105 ("*Marking Specifications*"); DS 00004098 (elements of product); DS 00002573 (specifications); DS 00002576 (color of drum and orange stripe); DS 00002579 (inspections by government): DS 00002710 (markings, orange band). *See also Fenner Tr at 54–55* (man-ufacturers prohibited from placing any warnings on drums). The method of use in Vietnam was classified. *See DS 00016965.* See also the Affidavit of William A. Krohley at 5–46 with extensive reference to documents, transcripts and other discovery material.

Federal officers acting pursuant to their authority under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 135–135k ("FIFRA"), directed defendants to supply Agent Orange without the warnings and directions which would have been used for any of defendants' commercial herbicides for civilian use. Federal officers did not register Agent Orange under FIFRA and did not comply with FIFRA requirements for warnings, relying on a statutory exception for "public officials while engaged in the performance of their official duties." 7 U.S.C. § 135e(a)(3). This exception extended to defendants as "person[s] acting for" such public officials pursuant to 7 U.S.C. § 135f(d). (Gordon Supp. Aff., Ex. 7 at ¶¶ 3–5.)

As pointed out above, defendants' Agent Orange contracts precisely specified the markings defendants were to place on the drums of herbicide. *See* Brock Aff., Ex. 11; McCarville Aff., Ex 14; Gordon Aff., Ex.12; Krohley Aff., Ex. 13; and Caley Aff., Ex 18. Federal officials prohibited defendants from any additional markings, warnings, instructions for use, or even identification of the contents of the drums, apparently for "security reasons." BDSA Division of Chemical and Allied Products worksheet for Request for Priorities Assistance (Mar. 27, 1967), Ex. 20 at ¶ 11 (report by BDSA analyst Jane Lewis requesting that Thompson Chemical Co. be directed to accelerate delivery of Agent Orange to the Department of Defense); Letter from W.J. Zepp at the BDSA to the Dow Government Marketing Manager

(Sept. 17, 1968), Ex 21 at ¶¶ 3–5 (relieving Dow from the directive accelerated production and delivery of Agent Orange to the Department of Defense). As this court stated: "[I]t is clear from the records that the highest officials in the United States were aware of the dangers and decided not to mark." Transcript before the court (E.D.N.Y. Feb. 26, 1992), Ex. 22; *see In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. at 818 (defendants' Agent Orange contracts "called for no warning on the drums about precautions and dangers"); *In re "Agent Orange" Prod. Liab. Litig., (Ivy Appeal)*, 996 F.2d 1425, 1436 (2d Cir.1993) ("[T]he Government strictly prescribed the markings on Agent Orange Barrels, and prohibited all extraneous label information, including warnings."), *cert. denied, Ivy v. Diamond Shamrock Chemicals Co.*, 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994). In addition to being prohibited from warnings, "the defendants had no control over how the government used the product after it was delivered." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. at 818.

Having all the above knowledge regarding dioxin and Agent Orange, the government made a "fully-informed" decision that the clear benefits of Agent Orange produced according to its specifications, control and inspections outweighed any risks. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d at 194. The government believed that Agent Orange was an "effective weapon" in a "unique battlefield environment." Transcript of Deposition of Army General W.C. Westmoreland, Ex. 23 at 31–32. The government continued to order defendants to supply Agent Orange until late 1969. As one high-level official testified, "[w]e were overwhelmingly convinced we were doing the right thing to save lives." Transcript of Deposition of Dr. Foster, Ex. 24 at 23–25.

## IV. Law

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L. E.2d 202 (1986); *see also* Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting the fraud shall be stated with particularity.").

All inferences are to be drawn from the underlying facts in the light must favorable to the party opposing the summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of some peripheral factual disputes will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant

or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505.

### B. Government Contractor Defense

Defendants argue that plaintiffs' claims are barred by the government contractor defense as developed by the Supreme Court of the United States. In *Boyle v. United Technologies Corp.*, the Court set forth what is known as the government contractor defense:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). "The military contractor's defense is premised on federal displacement of state law where state law significantly conflicts with the federal interest embodied in the federal government's sovereign immunity for discretionary functions." *In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 839 (2d Cir.1992). "Striped of its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.'" *In re Joint Eastern and Southern Dist. New York Asbestos Litigation (Grispo v. Eagle–Picher Industries, Inc.)*, 897 F.2d 626, 632 (2d Cir.1990).

The federal common law government contractor defense is warranted by the uniquely federal interest in government procurement and a "significant conflict" between federal policy and state tort law. *Boyle*, 487 U.S. at 507, 108 S.Ct. 2510. The Supreme Court found a basis for the defense in the Federal Torts Claim Act's (FTCA) exemption for the performance of discretionary government functions. *Id.* at 511, 108 S.Ct. 2510; 28 U.S.C. § 2680(a). It stated that the "selection of appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning" of Section 2680(a). *Boyle*, 487 U.S. at 511, 108 S.Ct. 2510. Suits against military contractors under state tort law would have the same effect that the FTCA exemption sought to avoid.

Even prior to the Supreme Court's ruling in *Boyle*, the theory of a generic military contractor defense was applicable to the Agent Orange litigation. This court cited an early incarnation of the government contractor defense in dismissing claims by veterans and members of their families who had opted out of the 1984 class action settlement. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1263 (E.D.N.Y.1985) (noting that at the time the defense had been "criticized," but remained "the law of the case"); *see also In re "Agent Orange" Prod. Liab. Litig.*, 534 F.Supp. 1046 (E.D.N.Y.1982). The Court of Appeals for the Second Circuit affirmed dismissal based on the government contractor defense, stating that under certain circumstances "federal law shields a contractor from liability for injuries caused by products ordered by the government for a distinctly military use." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 187, 190 (2d Cir.1987); *see also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 173 (2d Cir.1987) (describing military contractor defense as an "impossible, hurdle to surmount" for the plaintiffs). More recently, the Court of Appeals for the Fifth Circuit affirmed the district court's dismissal of an Agent Orange suit based on the government contractor defense. *Miller v. Diamond Shamrock*, 275 F.3d 414 (5th Cir.2001).

To assert the government contractor defense, defendants must prove each of three elements:

## 1. Reasonably Precise Specifications

■ The "reasonably precise specifications" must be "imposed" by the government, a situation in which the government officials are the "agents of decision." *Grispo,* 897 F.2d at 630. *Boyle* is largely silent on what government actions constitute ordering "reasonably precise specifications." A court deciding whether the government has ordered such specifications will look to whether the government had the responsibility for drafting and approving the specifications of the product and had sole discretion in their modification. *Zinck v. ITT Corp.,* 690 F.Supp. 1331, 1336 (S.D.N.Y.1988).

In *Lewis v. Babcock Industries, Inc.,* the plaintiff sustained injuries when the ejection mechanism in an Air Force fighter jet malfunctioned. 985 F.3d 83 (2d Cir.1993). The Second Circuit Court of Appeals found that the government had examined and approved components of the product. The government ordered a specific cable device, even though it knew the cable was susceptible to corrosion. The court held that when the government asked for a specific product, it had approved reasonably precise specifications. *Id.* at 89.

In *Zinck,* the government began a program to develop night vision goggles ten years before the contractor's involvement. The government initiated the design and controlled all phases of the program. *Zinck,* 690 F.Supp. at 1336. This constituted reasonably precise specifications. *See also Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67 (3d Cir.1990) (holding that government participation in design of ball bearing constituted more than rubber stamp); *Ramey v. Martin–Baker Aircraft Co.,* 874 F.2d 946 (4th Cir.1989) (Navy issued the original design specifications, inspected and tested product components, and examined model of product); *Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698 (4th Cir.1989) (contractor's design was approved by Navy and extensive discussions were held between contractor and Navy); *Smith v. Xerox Corp.,* 866 F.2d 135 (5th Cir.1989) (Army reviewed and approved drawings and specifications prepared by the contractor and government supplied relevant environmental specifications it wanted product to meet); *Stout v. Borg–Warner Corp.,* 933 F.2d 331 (5th Cir. 1991) (even though design specifications were silent on the issue of whether contractor could add a protective device, government thoroughly reviewed design); *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431 (5th Cir.2000) (government was extensively involved in approval process); *Tate v. Boeing Helicopters,* 55 F.3d 1150 (6th Cir.1995) (first prong is satisfied if parties engage in "continuous back and forth" review process); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992 (7th Cir.1996) (the fact that contractor may have retained some discretion within government specifications does not defeat the defense when government has substantially reviewed or evaluated the design); *Butler v. Ingalls Shipbuilding,* 89 F.3d 582 (9th Cir.1996) (Navy involved in design of the product, including testing and installation); *Wisner v. Unisys Corp.,* 917 F.Supp. 1501, 1510 (D.Kan.1996) (government designed product with virtually "microscopic precision"); *In re Aircraft Crash Lit., Frederick, Md.,* 752 F.Supp. 1326 (S.D.Ohio 1990) (detailed specifications were result of constant interaction and negotiations); *Russek v. Unisys Corp.,* 921 F.Supp. 1277, 1288 (D.N.J.1996) (government oversaw and participated in the design process and ultimately approved design in question with "continuous back and forth" review process); *Miller v. United Technologies Corp.,* 233 Conn. 732,

660 A.2d 810 (1995) (defense not defeated by the fact that the government was considering improvement to the design of the product, or that the government also approved an alternative design of the product); *Allison v. Merck & Co., Inc.,* 110 Nev. 762, 878 P.2d 948 (1994) (first prong shows more than mere government approval).

▣▣ Satisfaction of the first prong of the government contractor defense requires involvement on the part of the government in the design process. Evidence of this involvement may consist of its own experiments and tests of a predecessor product it is developing or cooperative procurement work with the suppliers. If the defense is to be viable, the government cannot surrender to the contractor complete discretion as to the minutiae of the specifications; active participation is required. *See, e.g., Trevino v. General Dynamics Corp.,* 865 F.2d 1474 (5th Cir.1989) (first prong not satisfied when Navy set only general performance standards for product and left the design to the complete discretion of the contractor); *Snell v. Bell Helicopter Textron,* 107 F.3d 744 (9th Cir. 1997) (record showed no discussion between government and contractor about the design of a critical feature of the product); *Johnson v. Grumman Corp.,* 806 F.Supp. 212 (W.D.Wis.1992) (if government delegates design discretion to the contractor, first prong is not satisfied merely because government approves the specifications submitted by the contractor).

Ordering ordinary off-the-shelf toothpaste in its usual commercial packaging would not satisfy this prong. Ordering special ingredients in a G.I. issue tube would. If the product is not ordered as "by model number, a quantity of stock" merchandise, there is a "significant conflict" with state tort requirements placed on manufacturers supplying the general public. *Boyle v. United Technologies Corp.,* 487 U.S. at 509, 108 S.Ct. 2510. As Judge Minor pointed out in his concurrence in *Grispo,* 897 F.2d at 638–39: "Agent Orange itself was composed of stock items, but the Government prescription of how those items should be combined and packaged was the key to the military contractor defense asserted by the manufacturer of that toxic chemical. *See, Agent Orange,* 818 F.2d at 191."

### 2. Conformity to Specifications

▣ The second element of the government contractor defense requires that the product ordered must have conformed to the government's specifications. *Boyle* does not explicate a standard or level of performance at which courts may deem a contractor's performance to be in conformity. In its simplest terms, a product conforms with government specifications when the government "receive[s] what it sought." *Lewis v. Babcock Industries, Inc.,* 985 F.2d 83, 89 (2d Cir.1993). Further evidence of conformity is provided when the government approves what it receives. *Id.* In *Babcock Industries,* the government requested cables of "certain dimension and strength characteristics," which it received. *Id.* at 89. The government also inspected and approved the cables. The Second Circuit Court of Appeals held that there were sufficient indicia of conformity with the government's specifications. *Id.; see also Zinck v. ITT Corp.* 690 F.Supp. 1331 (S.D.N.Y.1988) (government inspectors individually inspected each set of night goggles produced). "Nonconformance with a specification means ... that the ... [a]lleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications." *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431, 435 (5th Cir.2000).

As a matter of law, satisfaction of the second unit of the government contractor defense requires accurate conformity with specifications or government approval of the delivered product. *See, e.g., Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir.1989) (holding that appropriate specifications for conformity purposes are detailed quantitative ones and second prong is satisfied when Navy approved adjustments to product); *Smith v. Xerox*, 866 F.2d 135 (5th Cir.1989) (product would not have been utilized had it not passed inspection); *Quiles v. Sikorsky Aircraft*, 84 F.Supp.2d 154 (D.Mass.1999) (conclusion of conformance is subject to contrary evidence of non-conformance in fact).

■ If the government is aware that the product being procured has inherent dangers, the manufacturer is not liable if it follows specifications. *See, e.g. Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th Cir.1996) (unsafe placement of exhaust pipe and fuel tank on truck did not deviate from Marine Corps' specifications). In preparing for war, the armed forces will necessarily knowingly use products and equipment presenting some dangers to our forces or others where the vectors of lethality point towards the enemy.

■ The conformity prong of *Boyle* is not satisfied if the contractor fails to substantially follow the government's requirements, and the government is not aware of the deviations. *See, e.g., Miller v. United Technologies Corp.*, 233 Conn. 732, 660 A.2d 810 (1995) (contractor must comply with quantitative specifications, not qualitative remarks, precatory goals or safety guidelines); *Pietz v. Orthopedic Equipment Co.*, 562 So.2d 152 (Ala.1989) (conformity prong is not satisfied when contractor is forced to deviate from specifications even though specifications were deficient). *But see Landgraf v. McDonnell Douglas Helicopter Co.*, 993 F.2d 558 (6th Cir.1993) (contractor informed Army that design did not exactly follow written specifications and Army approved the departures); *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir.2001) ("Acceptance and use of an item following its production can establish that the items conformed to its specifications.").

### 3. Warning of Dangers Not Known to Government

■ The final element of the government contractor defense requires that the contractor warn the government "about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510. The third prong does not require contractors to warn the government of dangers already known to the government. *Babcock Industries, Inc.*, 985 F.2d at 89–90. In the military context, it is possible for the government to have greater knowledge of dangers than the contractor, and the third prong may be satisfied if the government "has greater knowledge of the problems" with the product. *Id.* at 90.

■ It is common for the Armed Forces to procure highly specialized devices or demand novel uses of civilian technology. *See, e.g.,* Defense Advanced Research Projects Agency (DARPA), Technology Transition (1997). As a result, its testing and knowledge of many products necessary in war exceeds that of any private entity. The government often outsources the production of a good, and the contractor is often in no position to warn of dangers since the details of ultimate intended use may not be revealed to it. Where the design and manufacturing of a product is a partnership between government and private interests, the contractor has a duty to warn of dangers not known to the public sector. *Babcock Industries*

provides an example of when the government has been long aware of a problem, and its equal knowledge of the dangers immunized the contractor from liability. *Babcock Industries, Inc.*, 985 F.2d at 90.

Similarly, in *Zinck*, the government provided the impetus for the production of night vision goggles. The contractor was brought in after the government initially developed the concept. The district court found that the government was "alerted to the goggles' limitations during field tests, certainly to an extent greater than [the contractor] was." *Zinck*, 690 F.Supp. at 1337. *See also, e.g., Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir.1990) (contractor provided engineering memoranda to the Army disclosing that ten percent of the proposed new bearings would fail); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th Cir.1996) (contractor satisfied duty to warn when government and contractor were aware of the same dangers); *Ramey v. Martin–Baker Aircraft Co.*, 874 F.2d 946 (4th Cir.1989) (Navy had full knowledge of dangers in the prevailing maintenance protocols); *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (contractor must warn only of dangers about which it had some knowledge); *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir.1989) (knowledge that a different but similar product was deficient cannot be imputed to contractor); *Stout v. Borg–Warner Corp.*, 933 F.2d 331 (5th Cir.1991) (danger was so obvious to anyone who observed product in operation that it was unnecessary for contractor to have warned of danger); *Zinck v. ITT Corp.*, 690 F.Supp. 1331, 1336 (S.D.N.Y.1988) (Army designed product and did field testing and any knowledge regarding dangers of the product was passed from the Army to the contractor); *Crespo v. Unisys Corp.*, 1996 WL 875565 (D.N.J.1996) (government had superior knowledge of dangers).

## C. Claims Based on Failure to Warn

*Boyle* applies the government contractor defense to design defects, stating that "[l]iability for *design defects* in military equipment cannot be imposed, pursuant to state law...." 486 U.S. at 512, 108 S.Ct. 1931 (emphasis added). The doctrine has been extended to cases in which the contractor has allegedly failed to satisfy its duty under state law to warn the plaintiff about the dangers associated with the product. In *Grispo*, the court declared:

> When a federal contract and state tort law give contrary messages as to the nature and content of required product warnings, they cause the sort of conflict *Boyle* found so detrimental to the federal interest in regulating the liabilities of military contractors. Just as with conflicting federal and state design requirements, the existence of conflicting federal and state warning requirements can undermine the Government's ability to control military procurement.

897 F.2d 626, 629 (2d Cir.1990).

■ In order for the government contractor defense to displace the duty to warn under state tort law, "the applicable federal contract must include warning requirements that significantly conflict with those that might be imposed by state law." *Id.* at 630. Displacement of state law must be preceded by a showing that the contents of the warnings—or the absence of warnings—were dictated by the government. *Densberger v. United Technologies Corp.*, 297 F.3d 66 (2d Cir.2002) (stating that plaintiffs cannot sue contractors "if government controlled which warnings the contractor was allowed to provide"); *see also Garner v. Santoro*, 865 F.2d 629 (5th Cir.1989). The test was set out in *Densberger*:

> The three requirements of the *Boyle* test for failure-to-warn cases are: (1)

'government control over the nature of product warnings'; (2) 'compliance with the Government's directions'; and (3) 'communication to the Government of all product dangers known to it but not to the Government.'

*Densberger*, 297 F.3d at 75 n. 11 (quoting *Grispo*, 897 F.2d at 630 n. 4.). This test also applies to circumstances in which the government dictated that there be no warnings at all. Displacement occurs whether the warnings for general commercial use were required pursuant to state law or federal regulations.

### D. Claims Based on Manufacturing Defects

The Supreme Court applied the government contract defense to design defect claims, and the Court of Appeals for the Second Circuit extended the defense to failure-to-warn claims. This circuit has not yet extended *Boyle* to claims based on manufacturing defects. *Compare Zinck v. ITT Corp.*, 690 F.Supp. 1331, 1337 (S.D.N.Y.1988) (government contractor defense does not apply to manufacturing defect claims), *and Nicholson v. United Technologies Corp.*, 697 F.Supp. 598, 603 (D.Conn.1988) (same), *with Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744 (9th Cir.1997) (government contractor defense applies).

In deciding whether *Boyle* applies to manufacturing defect claims, courts look to the nature of the conflict between the application of the state tort law and the federal interest in government procurement as described in *Boyle*. In *Grispo*, for example, when extending *Boyle* to failure to warn cases, the court inquired into the nature of any conflicts with the federal interest in regulating government contractors. 897 F.2d at 629. The displacement of state tort law defining manufacturing defects will occur only where a " 'significant conflict' exists between an identifiable

'federal policy or interest and the operation of state law.' " *Boyle*, 487 U.S. at 507, 108 S.Ct. 2510. In *Boyle*, the Court held that the duty of care under state tort law of design defects was at odds with the design responsibilities imposed by the United States.

The Court's inquiry did not end with the discovery of a conflict between state law and federal procurement. The government contractor defense was grounded in the Federal Tort Claim Act exemption applicable to "discretionary functions." *Id.* at 511, 108 S.Ct. 2510. In *Boyle*, the design of the military equipment involved engineering judgments and thoughtful tradeoffs, all of which fell under the rubric of discretionary functions. Thus, the conflict was resolved by application of the government contractor defense, articulating a three-prong test. *Id.* at 512, 108 S.Ct. 2510; *supra* Part IV.B. The federal common law defense was available only if the government wielded significant control over the design process. In extending *Boyle* to failure to warn cases, the Court of Appeals based its decision on whether the "federal contract and state tort law [gave] contrary messages as to the nature and content of required products warnings." *Grispo*, 897 F.2d at 629. The "contrary message" created the type of conflict about which *Boyle* warned and for which the Court crafted the government contractor defense. Under *Grispo*, therefore, when the government controls which warnings the contractor can use, *Boyle* governs.

This court need not determine whether *Boyle* also requires the displacement of the state tort law of manufacturing defects. *See, e.g., Snell*, 107 F.3d at 744 (defense applicable where government approved precise specifications); *Roll v. Tracor, Inc.*, 102 F.Supp.2d 1200, 1201–02 (D.Nev. 2000) (defects in manufacturing come within the defense if the government approved

the manufacturing technique leading to the deficit). If the government explicitly or implicitly approves the design and method of production and it is aware of resulting defects, *Boyle* would apply as in any design defect case. In the instant case, the government was aware of the manufacturing process that would be used, and that it could result in dioxin's presence in Agent Orange. It thus threw its cloak of contractors defense immunity over Agent Orange producers even though it and they knew of the dioxin in Agent Orange.

In determining the merit of a possible manufacturing defect claim, in the instant case, the court looks to whether defendants satisfied the second prong of the Boyle test, namely whether the product produced was in conformity with the government's specifications. *See, e.g., Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1321 (11th Cir.1989) ("To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured."); *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 246 (5th Cir.1990) (equating a failure to conform to government design specifications with a manufacturing defect); *Zinck,* 690 F.Supp. at 1338 ("For the same reasons that [the defendant] satisfied the second prong of the government contractor defense, plaintiffs cannot prevail on their claim of manufacturing defect.").

As indicated in the section on Facts, Part III, *supra,* and application of Law to Facts, Part V, *infra,* the government was aware that under the manufacturing processes utilized by defendants, dioxin was an inevitable component of Agent Orange. If defendants delivered a product that conformed with the government's specifications and its expectations, a manufacturing defect claim must fail.

## E. Cost of Denying Defense

The Supreme court in *Boyle* was concerned about the cost and difficulty of procurement without the protection provided by the government contractor defense. As it noted:

> The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.

487 U.S. at 507, 108 S.Ct. at 2516. It also declared:

> The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for production.

The cost problem is manifested in the present case where the defendants paid a large price to settle on the basis of dubious claims when they were only carrying out the government's orders. They are now being faced with possibly huge liabilities should these suits (and many others like them) go forward. Courts applying *Boyle*-based rules need to bear in mind that the legislature can step into the breach and provide compensation should the contractor defense block a private action. In the case of Agent Orange it has done so through a presumptive schedule of V.A. compensation for ill veterans—probably in-

cluding the present plaintiffs. *See also Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (compensation provided by Congress after the Texas City explosion disaster); Texas City Disaster Relief Act, Pub.L. No. 84–378, 69 Stat. 707 (1955); Monograph, Individual Justice in Mass Tort Litigation 17 (1995).

### F. Decisions Applying Defense to Agent Orange

The majority opinion in *In re Joint Eastern and Southern District New York Asbestos Litigation (Grispo),* 897 F.2d 626, 634 (2d Cir.1990), suggested in *obiter dictum* that *Boyle* may have limited the force of the Court of Appeals' prior Agent Orange based decisions applying the government contractor defense to that product:

> [T]he scope of our holding in *Agent Orange* has been trimmed by *Boyle* such that *Agent Orange* no longer carries the weight Eagle–Picher places upon it. *Agent Orange* grounded the military contractor defense upon broad separation-of-powers concerns counseling the insulation of military decisionmaking from judicial oversight. *See Agent Orange,* 818 F.2d at 190–91. Although these concerns certainly animated the Supreme Court's opinion in *Boyle, see Boyle,* 108 S.Ct. at 2517–18 (discussing need to prevent judicial "second–guessing" of selection of design of military equipment), *Boyle* ultimately cast the military contractor defense upon narrower grounds than we did in *Agent Orange.* In particular, *Boyle* predicated the military contractor defense upon the existence of a "significant conflict" between federal contracting requirements and state tort duties. For the conflict to be "significant," the Government must control product content by approving "reasonably precise specifications." *See id.* at 2518. *Agent Orange* neither

honed in upon the need for a "significant conflict" nor required that government specifications be "reasonably precise." *See Agent Orange,* 818 F.2d at 192 (first element of military contractor defense established upon showing "[t]hat the government established the specifications for Agent Orange"). We think these differences underscore the more exacting standard a military contractor must satisfy after *Boyle* to establish the military contractor defense and thus limit the value of the facts of *Agent Orange* as a benchmark in a failure-to-warn action for satisfaction of the military contractor defense after *Boyle.*

(Footnote omitted).

This statement of the *Boyle* rule in that asbestos case—while accurate as to the asbestos case then before the Court of Appeals for the Second Circuit—does not mention the fact that Agent Orange fully met the requirements of *Boyle.* First, the government knew more than the manufacturers about the dangers attendant on its design, specifications and manufacturing hazards of Agent Orange and dioxin, so that warnings to the government by defendants were not required. Second, the lack of warnings to users was a requirement of the government which specified exactly how the product was to be packaged in drums with an orange stripe, but no warnings. Third, the government determined how the product would be used. Any suggestion of an implied reservation about applicability of the contractor defense to Agent Orange in the *Joint Asbestos* cases has no bearing on a case involving Agent Orange itself. It should also be noted that the asbestos manufacturer-defendant was authorized to deliver its product in the same packaging it used for civilian consumers. *Id.* at 627 ("[C]ommercial packages are acceptable under this specification."). This was not the case with Agent

Orange. As the Court of Appeals for the Second Circuit pointed out in *Densberger,* "In failure to warn cases, . . . the ultimate product users cannot sue the contractor for failure to warn if the government controlled which warnings the contractor was allowed to provide *to those users,* and thereby precluded the warnings at issue from being given." 297 F.3d at 75 (emphasis in original).

The trial court correctly noted in *Zinck,* 690 F.Supp. at 1337:

> "It is clear from the record, in light of all the information received to date, that the government knew as much as, or more than, the defendant. . . . There is no substantial basis for believing that further discovery will reveal any persuasive information on this subject." "Agent Orange" Litigation, 611 F.Supp. 1223 at 1263 (E.D.N.Y.1985) [, aff'd 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).]

The dismissal of Agent Orange claims based upon the government contractor defense was affirmed by the Court of Appeals for the Second Circuit, which stated:

> We agree with the district court that the information possessed by the government at pertinent times was as great as, or greater than, that possessed by the chemical companies.

*In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 187, 190 (2d Cir.1987). This fact has not changed over the years. Even though plaintiffs are not now bound by doctrines of *res judicata, stare decisis* or collateral estoppel from raising the issue anew, examination of the evidence resubmitted in this motion to dismiss mandates that the contractor defense remains a bar to the suit as a matter of fact now newly decided.

The dismissal of Agent Orange claims by this court and the Court of Appeals for the Second Circuit in phases I and II of the Agent Orange litigation was based upon facts that were thoroughly developed during years of discovery. Those facts—relating to the government's specifications for Agent Orange, defendant's compliance with those specifications, and the knowledge of the government and defendants as to the hazards of Agent Orange—have remained constant. The papers submitted on this motion to dismiss and the conclusions to be drawn from them are not disputable; they establish the *Boyle* defense beyond cavil.

Nor has the law's affects, in its operative essential now applied, changed prior Agent Orange conclusions. In *Boyle,* the Supreme Court adopted essentially the same three-pronged test for the application of the government contractor defense that had been applied in this court's 1985 Agent Orange decision:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

487 U.S. at 512, 108 S.Ct. 2510.

Five years after *Boyle,* the Court of Appeals for the Second Circuit reiterated that the government contractor defense would still preclude claims of Vietnam veterans and their family members who claimed that their exposure to Agent Orange caused injuries that were manifested after the 1984 settlement. *In re "Agent Orange" Prod. Liab. Litig.,* 996 F.2d at 1436, *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994):

> It is clear from the chemical companies' contracts with the Government that the

Government specified Agent Orange's ingredients in great detail. There also is documentary evidence tending to show that the Government strictly prescribed the markings on Agent Orange barrels, and prohibited all extraneous label information, including warnings. Finally, there is evidence that the Government's knowledge of the hazards of Agent Orange and dioxin was at least as great as that of the chemical companies, making it unlikely that there were "dangers ... that were known to the suppliers but not to the United States," of which the suppliers should have warned. *Boyle, supra,* 487 U.S. at 512, 108 S.Ct. at 2518. In sum, although the availability of the government contract defense might not be a foregone conclusion, there is a reasonable probability that it would apply, barring any recovery by the plaintiffs.

The Court of Appeals for the Fifth Circuit, following *Boyle,* conducted a detailed evaluation of the same undisputable Agent Orange facts—now, once again, before this court—with respect to each of the three elements of the government contractor defense. The Court of Appeals for that Circuit expressly agreed with the decisions of this court and the Court of Appeals for the Second Circuit and affirmed summary judgment based on the government contractor defense:

> This case is yet another episode in the great Agent Orange saga. In this appeal, we review the district court's decision to grant the defendant-appellees' motion for summary judgment where the decision was based exclusively on the military contractor defense.

\* \* \*

The plaintiffs have failed to demonstrate any genuine issue of material fact with respect to any one of the three elements of the military contractor defense. Thus, the district court properly granted the defendants' motion for summary judgment.

*Miller v. Diamond Shamrock,* 275 F.3d 414, 416, 423 (5th Cir.2001).

## V. Application of Law to Facts

### A. Design Defect Claim

 Each element of the Government Contractor Defense has been established. Viewing the pleadings and facts in a way most favorably to plaintiffs, no juror could fail to find:

1) The government approved precise specifications for the Agent Orange as set forth in contracts with various administrative agencies and divisions of the Armed Forces. These differed substantially from "off-the-shelf" products the defendants were producing for their civilian markets.

2) The Agent Orange delivered by defendants conformed to these government specifications. This was verified by close checks through government inspectors.

3) The government knew substantially more about possible dangers of Agent Orange as it intended to, and did, use it than did any or all of the defendants combined.

### B. Failure–to–Warn Claim

 Each element of the Government Contractor Defense has been established. Viewing the pleadings and facts in a way most favorably to plaintiffs, no juror could fail to find:

1) The government had control over the markings, including possible product warnings. It forbade the placement of warnings on the barrels.

2) The Agent Orange delivered by defendants conformed to the govern-

ment order that there be no product warnings on the Agent Orange. This was verified by close checks through government inspectors.

3) The government knew substantially more about possible dangers of Agent Orange as it intended to, and did, use it than did any or all of the defendants combined.

## C. Manufacturing Defect Claim

 Having found that the Agent Orange produced by defendants conformed to the government's precise specifications, the manufacturing defect claim cannot stand. Moreover, the government was aware of alternative manufacturing processes that might potentially mitigate the presence of dioxin in Agent Orange. In its quest for maximum production of Agent Orange as a tool of war, the government's benign connivance failed to specify another production process, sanctioning defendants' use of the then-existing technology, leading inexorably to some dioxin in Agent Orange.

## VI. Conclusion

Failure to apply the government contractor defense in cases such as this one would substantially inhibit the United States from obtaining equipment and products for its armed forces in time of emergencies or war. Failure to afford this defense would have the potential of enormously increasing the cost to the government of purchasing such materials because suppliers would have to include in the price the cost of almost unlimited and unknowable possible liability for future tort claims. Added to costs of such prospective suits would be the difficulty of resolving many claims through a global settlement protecting against future claims—a problem illustrated by this very litigation and the overhanging huge numbers of potential future like suits.

The cases are dismissed without costs or disbursements.

## VII. Discovery and Stay

At the hearing on this motion to dismiss, plaintiffs explained their failure to adequately respond by noting difficulties in obtaining evidence for their position. This problem is understandable since the events at issue occurred forty or more years ago. Plaintiffs have asked for an additional six months for discovery. *See* Part I, *supra.*

To ensure due process, this decision is stayed until October 12, 2004. Discovery on the issues posed by the government contractor defense may continue to August 10, 2004. Plaintiffs may make a motion to reconsider by filing papers on or before September 10, 2004. If made, the motion will be heard on October 10, 2004. In the meantime, the magistrate judge, clerk of the court, other parties and the undersigned will make every effort to assist plaintiffs in consolidated discovery limited to the issues raised on this motion to dismiss.

SO ORDERED.